[No: B048185. Second Dist., Div. Seven. Oct. 7, 1991.]

JEFFER, MANGELS & BUTLER, Plaintiff, Cross-defendant and Respondent, v.
STANLEY GLICKMAN et al., Defendants, Cross-complainants and Appellants.

COUNSEL

Baltaxe & Rutkin and George Baltaxe for Defendants, Cross-complainants and Appellants.

Musick, Peeler & Garrett, William McD. Miller III and Eric L. Troff for Plaintiff, Cross-defendant and Respondent.

OPINION

JOHNSON, J.—This is an appeal from a nonsuit granted in favor of the cross-defendants in an attorney malpractice case. The trial court granted the nonsuit after ruling the cross-complainants' witness was not qualified to testify as an expert. We reverse.

FACTS AND PROCEEDINGS BELOW

I. THE CASE IN GENERAL.

Appellants introduced the following evidence at trial.

In 1983, appellants Glickman and Field (the Field Group) filed a "de novo" application to form a new savings and loan. Because there were about 60 applications ahead of the Field Group it looked doubtful they would receive a charter. Consequently, they reached an agreement with the "Sherman Oaks Group," which was higher up on the list, to take over its application in process to create Sherman Oaks Savings and Loan. Such a move was risky because the federal regulators were against "line jumping." In addition, the proposed takeover involved paying money to the Sherman Oaks Group, which the chief counsel for the Department of Savings and Loan viewed as improper. Both parties agreed the respondent, Jeffer, Mangels & Butler, which was handling the Sherman Oaks application, should remain as counsel for the Field Group as well.

To effect the takeover, a document was drafted by Jeffer, Mangels & Butler which provided in relevant part:

"(d)   The Field Group will subscribe for 55% of the Association. The members of the Sherman Oaks Group will subscribe for the remaining 45% in such proportions as they may determine in their sole discretion. The Field Group will be solely responsible for facilitating and arranging for the funding of the capitalization of Sherman Oaks (Exhibit 1)."

In essence, this paragraph changed the control of the prospective Sherman Oaks Savings and Loan to the Field Group. To transfer the balance of the ownership, an additional paragraph provided for essentially a put and call option which allowed the Field Group to acquire the remaining 45 percent as soon as the savings and loan was chartered.

Jeffer, Mangels & Butler's representative, Mr. Ashton, believed the chances of this agreement getting through the regulators was a "crapshoot" because it showed the Field Group was trying to jump ahead in line. At his deposition he did not recall expressing that view to the Field Group or the Sherman Oaks Group. At trial, Ashton testified he did express this view to the Field Group. Ashton considered approaching the regulators with the proposed agreement to discuss whether it was permissible but he ultimately rejected this idea because he thought he might not get an answer that was meaningful and he didn't want to "blow the whole thing out of proportion" or "wave a red flag" in front of the regulators as to the line jumping.

On October 29, 1985, the Federal Home Loan Bank Board refused to insure the new accounts of the proposed Sherman Oaks Savings and Loan because of the change of control. This was the death knell of the Sherman Oaks Savings and Loan application.

Jeffer, Mangels & Butler subsequently sued the Field Group for attorney's fees. The Field Group filed a cross-complaint alleging Jeffer, Mangels & Butler was negligent in failing to warn them of the risks involved with this takeover.

## II. The Disqualification of Appellants' Expert.

The Field Group offered Jerry Fine, the senior partner of the firm Fine, Perzik & Friedman, as their expert to explain the proper standard of care in advising the parties with regard to this takeover and the hostility of the regulators toward line jumping. Mr. Fine's firm has extensive experience with savings and loan law. The firm started into business with de novo applications for new savings and loans in 1963. Mr. Fine had two applications that were granted in the 1970's. His firm has represented clients in their acquisition of savings and loans and worked on behalf of the Federal Savings & Loan Insurance Corporation (FSLIC) to manage a savings and loan that was in difficulty.

During the 1980's, Mr. Fine's firm handled three applications for savings and loans which were given preliminary approval at the state savings and loan level but were not approved for insurance by the Federal Home Loan Bank Board. Mr. Fine testified he was familiar with the rules and regulations

on how to file de novo applications and had attended meetings held by the California Savings and Loan League which discussed the subject.

About 15 to 20 percent of Mr. Fine's practice relates to counseling prospective savings and loan applicants and filing de novo applications.

Mr. Fine testified he had an ongoing acquaintance with regulators in the industry, and had talked with them about various requirements, what is going on in the industry, what pitfalls existed, and various things that come up from time to time for someone such as himself who is active in the industry and part of it.

Upon conclusion of the Field Group's presentation of Mr. Fine's qualifications to testify as an expert, the court stated, "He has a huge amount of experience, but he has to prove that he has experience in filing de novo applications. That is all we are concerned with, and even if it is the simplest or most complicated thing in the world, that is all we are concerned with, and he has never had one approved."

The Field Group explained to the court the subject about which Mr. Fine would testify involved: the proper advice the respondents should have provided regarding the risks of the takeover; the disingenuousness of the document; and that a reasonable attorney in the field, with nothing to fear from regulators, would have taken it to them for an advisory opinion. The court responded, however, "I think anyone who has not carried an application through to completion with the issuance of a certificate and insurance is not qualified." Consequently, when the court ruled there was no way for the Field Group to put on any expert testimony, a nonsuit was granted.

### DISCUSSION

The question before this court is whether Mr. Fine was sufficiently qualified to give the opinion a reasonably prudent attorney, familiar with savings and loan law and the process of establishing a savings and loan, would have dissuaded the Field Group from attempting to submit an application that clearly demonstrated a change of control from the already existing application.

Evidence Code section 720, subdivision (a), guides our review. That section provides: "A person is qualified to testify as an expert if he [or she] has special knowledge, skill, experience, training, or education sufficient to qualify him or her as an expert on the subject to which the testimony relates." Interpreting this code section either broadly or narrowly provides

different results for a given factual situation. Because legal malpractice actions are similar to medical malpractice actions, the interpretation of the code in the medical malpractice context will also guide us in the legal malpractice context.

## I. THE STANDARDS FOR REVIEWING THE QUALIFICATIONS OF EXPERTS IN A LEGAL MALPRACTICE ACTION ARE THE SAME AS IN A MEDICAL MALPRACTICE ACTION.

■ There is no jurisprudence in the State of California interpreting Evidence Code section 720[1] in the context of legal malpractice. We find, however, the law's treatment of medical malpractice is sufficiently analogous to legal malpractice for the standards regarding the qualifications of experts in medical malpractice cases to serve as a guide in reviewing whether the trial court abused its discretion by refusing to permit Mr. Fine to testify.

The California Court of Appeal in *Lysick v. Walcom* (1968) 258 Cal.App.2d 136 [65 Cal.Rptr. 406, 28 A.L.R.3d 368] was faced with a similar dearth of cases in deciding whether expert testimony in legal malpractice cases should be conclusive upon the jury. The court reasoned, "This rule has been applied in California to medical malpractice cases, and while no cases have been found in this state applying the rule to legal malpractice, there is no reason why the rules of evidence for malpractice against a lawyer should not be the same as those governing cases against doctors." (*Id.* at p. 156.)

Although the respondent does not provide arguments to counter the use of medical malpractice jurisprudence in this legal context[2] the respondent's brief does suggest three reasons why the current lenient standard regarding the qualifications of experts in the medical malpractice context exists. As the following discussion of these three reasons shows quite clearly, our use of medical malpractice standards for interpreting section 720 in the legal malpractice context is both logical and appropriate.

### A. *Legal Specialists, Like Medical Specialists, Are Reluctant to Testify Against One Another.*

*Evans v. Ohanesian* (1974) 39 Cal.App.3d 121, 128 [112 Cal.Rptr. 236] recognized physicians are reluctant to testify against each other. The respon-

---

[1] All statutory references are to the Evidence Code unless otherwise indicated.

[2] The respondent confines its argument to the facts of the instant case and offers no reason the standards governing expert qualifications of medical malpractice should not also govern legal malpractice *in general*.

dent notes there is no similar judicial recognition that "savings and loan experts" are reluctant to testify against each other. The lack of case law asserting this fact comes as no surprise—simply because there are no cases on the subject of expert qualifications in the field of attorney malpractice. But, in the absence of a precedent stating the obvious, common sense will suffice.

Members of a profession, especially those members who specialize in a particular field, such as savings and loan law, will naturally be reluctant to testify against one another. Respect for fellow specialists, understanding of the complexities of the specialty and the margin for error, and fear of retaliation are motivations which could lead any professional to refuse to take the stand against a colleague. Such motivations are not unique to physicians and it requires no stretch of the imagination to believe an attorney who specializes in a field of law would be reluctant to testify against fellow specialists in that same field.

### B. A Broad Standard of Qualifications Is as Appropriate in the Legal Malpractice Context as It Is in the Medical Malpractice Context.

As the Supreme Court noted in *Brown* v. *Colm* (1974) 11 Cal.3d 639, 646 [114 Cal.Rptr. 128, 522 P.2d 688], "[I]t is obvious that an overly strict standard of qualification would make it difficult and in some instances virtually impossible to secure a qualified expert witness." Certainly, an interpretation of section 720 which required a physician expert to have performed the same operation on the same patient or an attorney expert to have advised the same client in the same case obviously would be contrary to the intent of section 720. The *Brown* court used similar reasoning to find a liberalization of the rules regarding the qualifications of experts in medical malpractice actions is appropriate and indeed has been the trend. (11 Cal.3d at pp. 646-47.)

In *Brown*, the court reversed the trial court's refusal to permit a physician to testify who had not practiced medicine in 1949, the time of the alleged negligent surgery. The court held: "[A]n invariable rule which would require in all cases that an expert must have acquired a personal, working knowledge of the standard of care at the precise time when the alleged malpractice occurred would be untenable." (11 Cal.3d at p. 644.) An earlier case, *Valdez* v. *Percy* (1950) 35 Cal.2d 338 [217 P.2d 422], also demonstrates the leniency in considering qualifications of medical experts. In *Valdez*, the court found it was not error to permit a physician to testify who had not performed the kind of surgery at issue because his testimony was relevant on the question of the

exercise of care in the field and in the matter of the desirability of the main operation. (*Id.* at p. 342.)

The respondent suggests the reason why there is a liberalization of the qualifications for physician experts is because there are many rare conditions the majority of physicians are not afforded the opportunity to treat. This position is reasonable given the case law cited by *Brown* supporting its analysis of the trend toward a liberal interpretation of section 720. (See *Brown* v. *Colm, supra,* 11 Cal.3d at p. 646.) Rarity is common in the practice of law as well. Therefore liberalizing the qualifications standards of lawyer experts is similarly appropriate. This case serves as an example. Not every attorney who specializes in savings and loan law has the opportunity to process applications through the Federal Home Loan Bank Board (Board). But many attorneys, specializing in the savings and loan field, will be familiar with the Board's standards regarding change of control from having dealt with the Board in other matters or for other reasons discussed below.

C. *Private Study of a Subject and Contact With Other Professionals in the Field May Qualify an Attorney Expert Just as It May Qualify a Physician Expert.*

*Bennett* v. *Los Angeles Tumor Institute* (1951) 102 Cal.App.2d 293, 297 [227 P.2d 473] suggests a physician may be qualified to testify as an expert if he has made a "private study of the subject through attendance at lectures, reading, or by contact with other men in the field." An early case, *Mirich* v. *Balsinger* (1942) 53 Cal.App.2d 103 [127 P.2d 639], provides an example. In *Mirich,* a doctor of otolaryngology (ear, nose and throat) was permitted to testify as an expert witness in a medical malpractice case involving improper plastic surgery. (*Mirich* v. *Balsinger, supra,* 53 Cal.App.2d at p. 115.) The doctor-witness had performed mostly intranasal surgery but had made a study of the causes of atresia of the nose—the condition the plaintiff ultimately developed. Furthermore, the witness had undertaken a course in plastic surgery from a national authority on the subject.

Qualifying experts under the theory sufficient expertise may be acquired from sources other than practice is also consistent with Professor Wigmore's explanation of what constitutes experience in a field. He states, "In experience, then, are included all the processes—the continual use of the faculties, the habit and practice of an occupation, special study, professional training, and the rest—which contribute to produce a fitness to acquire accurate knowledge upon a given subject." (2 Wigmore, Evidence (Chadbourn ed. 1979) § 555, p. 750.)

Lawyers, like doctors, are in a position to become experts from having studied a particular field of law and from discussing the field with colleagues. Continuing the example of savings and loan experts above, an attorney who has studied the field of savings and loan law and has contacted other professionals for additional exposure to the subject is qualified to provide expert testimony on the subject. Actually having processed one particular form may not be necessary. Of course, the depth of study and exposure is relevant in determining if the attorney is sufficiently qualified, but the proposition that other forms of exposure besides practice may qualify a physician holds true for attorneys as well.

█ The similarity between medical malpractice and legal malpractice actions is rooted in the nature of malpractice. The standard of care must be established so the jury can understand the "propriety of particular conduct by the practitioner in particular instances because such standard and skill is not a matter of general knowledge." (*Lysick* v. *Walcom, supra,* 258 Cal.App.2d at p. 156.) █ The similarity between medicine and law, on the other hand, is rooted in the fact both are professions. As the above discussion illustrates with regard to three reasons the courts have chosen to interpret section 720 liberally in the area of medical malpractice, the practice of law and the practice of medicine are analogous. The standards of reviewing the qualifications of an expert witness for a medical malpractice action will therefore serve to guide us in reviewing the qualifications of an expert witness for a legal malpractice action.

II. SECTION 720 HAS BEEN INTERPRETED LIBERALLY IN THE MEDICAL MALPRACTICE CONTEXT TO PERMIT QUALIFYING EXPERTS WHO HAVE NOT ACTUALLY PERFORMED THE SAME FUNCTION ABOUT WHICH THEY PROPOSE TO OFFER EXPERT OPINION TESTIMONY.

█ As the *Brown* court explained, the earlier cases involving the qualifications of medical experts required a much closer "fit" between the litigant and the expert in terms of practical experience. Beginning with the dismantling of the "locality rule," however, the court gradually chipped away at the prevailing narrow interpretation of section 720 and eventually physician experts were testifying on subjects with which they had exposure and were familiar but were outside their discipline. (*Brown* v. *Colm, supra,* 11 Cal.3d at pp. 645-646.) The *Brown* court stated: "The unmistakable general trend in recent years has been toward liberalizing the rules relating to the testimonial qualifications of medical experts. Thus, whereas a number of earlier cases held that a physician of necessity must possess the skill ordinarily practiced only in the *same* locality only six years later this requirement was relaxed so that a physician was deemed qualified as an expert if he could testify to the

practice in a *similar* community. Some early cases were unbending in requiring expertise as to the precise injury involved in the litigation, as, e.g., not permitting an autopsy surgeon to testify on urology. Other authorities, however, have permitted variations, as, e.g., a pathologist was qualified to testify as to causes of aseptic necrosis; an expert in otolaryngology to testify regarding plastic surgery; a homeopathic physician and surgeon to testify on the degree of care required of a physician educated in the allopathic school of medicine; a pathologist and professor of pathology to testify on the subject of gynecology." (*Brown* v. *Colm, supra,* 11 Cal.3d at p. 646, citations omitted, italics in original.)

The current standard is well summarized in Corpus Juris Secundum: "It is not essential that the witness should ever have treated the disease or injury in question, or should have been confronted, in his practice, with a situation exactly like that which was the subject of the litigation; neither is it necessary that he be familiar with the method of treatment employed in the particular case, or that the witness be a specialist, those being matters going to the weight rather than the competency, of the testimony. However, the qualification must relate to the branch of the medical field involved in the case. . . ." (32 C.J.S., Evidence, § 546, pp. 341-342.) Cases cited as supporting this summary from Corpus Juris Secundum include *Valdez* v. *Percy, supra,* 35 Cal.2d 338 and *Thompson* v. *City of Long Beach* (1953) 41 Cal.2d 235 [259 P.2d 649].

Professor Witkin likewise defines the current standard as a liberal one. He stated: "The decisions disclose considerable uncertainty as to the proper qualification of a doctor witness in an action concerned with a special field of medicine. It has been held, however, that *different basic training* is not necessarily a disqualifying factor; a physician trained in one medical school or branch of medicine may testify in a case involving a physician of another school, where he is familiar with the particular treatment involved." (3 Witkin, Cal. Evidence (3d ed. 1986) Introduction of Evidence at Trial, § 1846, pp. 1801-1802.)

Of course, this broad standard does not suggest experts should be permitted to testify regardless of their knowledge of the subject matter. The party offering the expert must demonstrate the expert's knowledge of the subject is sufficient; a determination left to the sound discretion of the trial judge. (*Sinz* v. *Owens* (1949) 33 Cal.2d 749, 755 [205 P.2d 3, 8 A.L.R.2d 757].) The determinative issue in each case must be whether the witness has sufficient skill or experience in the field so his testimony would be likely to assist the jury in the search for the truth. (Evid. Code § 801, subd. (a); *Brown* v. *Colm, supra,* 11 Cal.3d at p. 645.) The trial court will be deemed to have abused its discretion if the witness has disclosed sufficient knowledge of the subject to

entitle his opinion to go before the jury. (*Seneris* v. *Haas* (1955) 45 Cal.2d 811, 833 [291 P.2d 915, 53 A.L.R.2d 124].)

If the threshold test of general testimonial qualifications is found to be met and the expert is permitted to testify, the sufficiency of the expert's knowledge may also be tested by "as penetrating a cross-examination as the ingenuity and intellect of opposing counsel can devise." (*Brown* v. *Colm*, *supra*, 11 Cal.3d at p. 646.) The witness may be challenged on the reasons for his opinion and his evaluation of material in preparation for testimony as provided in section 721. And the opposing party may also produce his own witnesses in rebuttal. As the *Brown* court explained, these measures are more than adequate to protect a litigant's interests. (11 Cal.3d at p. 646.)

Thus, in general, the law favors permitting experts to testify in malpractice cases if they demonstrate sufficient knowledge of the subject that their opinions will be helpful to the jury in the search for the truth. (11 Cal.3d at p. 645.) If a witness has passed this threshold, the question of the degree of the witness's knowledge goes to the weight of the testimony rather than to its admissibility. (*Id.* at p. 643, quoting *Seneris* v. *Haas*, *supra*, 45 Cal.2d at p. 833.)

### III. Because Fine Demonstrated Sufficient Knowledge of the Savings and Loan Field of Law to Assist the Jury in the Search for Truth the Trial Court Abused Its Discretion in Refusing to Permit Him to Testify.

Using the above standard for determining if a witness is qualified to testify as an expert, the question becomes whether appellants demonstrated Mr. Fine had sufficient knowledge of savings and loan matters to assist the jury in determining whether the respondent law firm was negligent in its advice to the appellants. We conclude the appellants have demonstrated Mr. Fine meets this threshold standard. Therefore, it was an abuse of discretion for the trial court to refuse to permit Fine to testify. (See *Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 39 [210 Cal.Rptr. 762, 694 P.2d 1134].)

The court below was confused about the subject Fine was to testify about. The court stated, "[H]e has to prove that he has experience in filing de novo applications. That is all we are concerned with. . . ." In fact, however, the appellants' expert witness was to offer testimony about the *standard of care the respondent law firm should have exercised in advising the appellants* about the takeover of Sherman Oaks' application.

Mr. Fine's "huge amount of experience" in the savings and loan field, as the trial court put it, is more than sufficient to satisfy the threshold require-

ment he know enough about the subject to be able to assist the jury in the search for truth. Mr. Fine is the senior partner in a law firm of nine lawyers which specializes in savings and loan law. He has filed applications for insurance with the Federal Home Loan Bank Board, he is familiar with the regulations on how to file applications, and he has consulted prospective applicants about the process of applying and the requirements of the government. In addition, Mr. Fine had an ongoing acquaintance with two regulators at the California Department of Savings and Loan and often discussed with them requirements, pitfalls and the industry in general. Carrying an application to acquire insurance for a savings and loan through to completion would add little to his ability to tell the jury what factors should have been weighed in the decision whether to proceed with the application.

The present case is similar to *Valdez* v. *Percy, supra,* 35 Cal.2d 338. In that case, the plaintiff's right breast was removed because of an improper diagnosis of carcinoma of the breast. The procedure used was a special cauterizing method developed by the defendant. The plaintiff's expert, Dr. Webb, had only practiced as a physician to a limited extent in recent years and his practice did not include tumor surgery, nor had he ever used the defendant's cauterizing method. The trial court permitted him to testify about the necessity for or desirability of the operation and any limitations in his qualifications went to the weight rather than the competency of his testimony. (*Valdez* v. *Percy, supra,* 35 Cal.2d at p. 342.) In the present case, Mr. Fine's testimony is about the desirability of pursuing the change of control in the first place. The fact that he has never had a de novo application processed completely does not disqualify him just as the fact that Dr. Webb was not a skilled tumor surgeon and had not used the defendant's method did not disqualify Webb from providing testimony as to the desirability of the operation.

Any effect of Mr. Fine's not having processed a de novo application through to completion goes to the weight of his testimony not its admissibility. (See *Brown* v. *Colm, supra,* 11 Cal.3d at p. 643, quoting *Seneris* v. *Haas, supra,* 45 Cal.2d at p. 833.) At trial, opposing counsel will be free to cross-examine Mr. Fine in an attempt to discredit his testimony. Likewise, respondent may offer expert testimony of its own. As Justice Mosk observed in *Brown,* 11 Cal.3d at page 646, "these measures are more than adequate to protect a defendant's interests."

█ In their petition for rehearing, respondents request that we "specifically delineate" the issues Mr. Fine may address as an expert upon retrial. This request may be a good faith attempt to prevent further evidentiary disputes or it may be an attempt to lay the groundwork for objections at trial

that Mr. Fine's testimony is not within a subject "specifically delineated" by the Court of Appeal. It is our holding that Mr. Fine may testify to any matter within his expertise in the savings and loan field relevant to the alleged negligence of Jeffer, Mangels & Butler including, but not limited to, whether the law firm was negligent in its advice to cross-complainants; the standard of care the law firm should have exercised in advising cross-complainants about the takeover of the Sherman Oaks application; whether a reasonably prudent attorney, familiar with savings and loan law and the process of establishing a savings and loan, would have dissuaded cross-complainants from attempting to submit an application that clearly demonstrated a change of control from the already existing application; the proper advice the law firm should have provided cross-complainants regarding the risk of the savings and loan takeover; the disingenuousness of the cross-complainants' application; and whether a reasonable attorney in the field, with nothing to fear from regulators would have taken cross-complainants' application to them for an advisory opinion. Beyond this, we rely on the parties' good faith and the trial court's good judgment to resolve any further questions about Mr. Fine's testimony in a manner consistent with the views expressed in this opinion.

## DISPOSITION

The judgment is reversed and the cause remanded to the superior court for further proceedings consistent with this opinion. Appellants to receive their costs on appeal.

Lillie, P. J., and Woods (Fred), J., concurred.

A petition for a rehearing was denied November 6, 1991, and respondent's petition for review by the Supreme Court was denied January 16, 1992. Mosk, J., was of the opinion that the petition should be granted.