[No. A050598. First Dist., Div. Five. Apr. 7, 1992.]

JOSEPH ALEF, a Minor, etc., Plaintiff and Appellant, v.
ALTA BATES HOSPITAL et al., Defendants and Respondents.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976 and 976.1, this opinion is certified for publication with the exception of parts III through VIII.

**COUNSEL**

John Gardenal and Gail Chesney for Plaintiff and Appellant.

Crosby, Heafey, Roach & May, Joseph P. Mascovich, James C. Martin, John M. Kern, Cathleen A. Wadhams, Charles Bond, Stefanie Y. Gandolfi, Mark P. Epstein, Craddick, Candland & Conti and Marrs Craddick for Defendants and Respondents.

**OPINION**

**HANING, J.**—Plaintiff/appellant Joseph Alef, a minor, appeals judgments in favor of defendants/respondents Alta Bates Hospital (Alta Bates), Roger Hoag, M.D., and Robert Neff, M.D., in appellant's medical malpractice action. At the close of appellant's case-in-chief the trial court granted Alta Bates's motion for nonsuit. Thereafter, by special verdict the jury found

Hoag and Neff were not negligent. Appellant contends there was sufficient evidence to submit the case against Alta Bates to the jury, and assigns numerous evidentiary errors. We reverse the nonsuit and the judgment for Neff, and affirm the judgment for Hoag.

FACTS

Drs. Neff and Hoag are obstetricians and gynecologists (OB/GYN). In September 1980 Neff confirmed that appellant's mother, Lis, was pregnant. She had an essentially unremarkable pregnancy and was a candidate for Alta Bates's alternative birth center.

At about 6:30 a.m. on April 7, 1981, Lis went into labor at home, notified Hoag, and left for Alta Bates at about 11:30 a.m. Upon admission she was in the active phase of the first stage of labor. The first stage of labor is divided into latent and active phases. The latent phase begins with the onset of contractions until the cervix is about four centimeters dilated. The active phase begins at that point and ends when the cervix is fully dilated. The second stage of labor begins with full cervical dilation and concludes with delivery of the baby. The third stage begins with delivery of the baby and ends with delivery of the placenta.

The fetal heart rate is monitored during labor to detect changes in the heart rate signifying that the fetus may be in distress from oxygen deprivation (hypoxia). Since the heart rate will generally manifest the effect of oxygen deprivation before irreversible brain damage occurs, monitoring permits detection of the change in fetal heart rate in time to intervene and prevent brain damage. A normal fetal heart rate ranges between 120 and 160 beats per minute. A principal sign of hypoxia is a late deceleration in the fetal heart rate, which takes place at the peak of the uterine contraction and involves a drop to 80 to 100 beats per minute. Following the contraction the heart rate returns to normal and then decelerates again at the peak of the contraction. Repeated late decelerations occurring for at least 30 minutes to one hour are indicative of fetal distress.

Upon Lis's admission to the hospital, the fetal heart rate was normal. The nurses monitored it using the auscultation method. This involves an instrument called a Doppler, which produces an ultrasound wave that detects and amplifies the fetal heart beat, which is then heard through a stethoscope. Alternatively, electronic fetal monitoring (EFM) involves placing electrodes on the mother's abdomen and produces a constant visual and written display of fetal heart activity. Although Alta Bates had EFM equipment available, Neff and Hoag did not think it would be helpful in this case.

Dr. Neff arrived at the hospital and examined Lis between 6:30 and 7 p.m. Her cervix was between eight and nine centimeters dilated, and the fetal heart beat was considered "fine." Neff still considered her a candidate for natural delivery if things proceeded appropriately from that point. Full dilation was attained at 8:15 p.m.

When Neff examined Lis at 10 p.m., she was making slow progress. He determined that because of the descent of the fetus's head and its steady and strong heart tones, Lis could continue to push for 20 or 30 minutes, after which they would consider expediting delivery by other than natural means. At 10:20 p.m. the fetus's head was visible in the perineum and Neff expected a vaginal delivery in five or ten minutes, determining that would be the most expeditious method of delivery. At about 10:45 p.m., Neff repositioned Lis in a squatting position, and delivery occurred at 11:06 p.m. Upon delivery, appellant appeared to be within the standard of normalcy for a posterior baby, with molding, caput (swelling of the soft tissues of the scalp), and cyanosis (bluish skin color). According to Neff, there was no evidence of fetal distress at any time during labor and delivery.

Following delivery, Neff used suction equipment to remove mucous from appellant's mouth and nose and handed him to a nurse anesthetist, who also suctioned him and administered oxygen for three minutes. At 11:20 p.m. the nurse anesthetist transferred appellant to the Intensive Care Nursery (ICN). The ICN record indicates appellant was wearing an oxygen mask and his color was pink. His tone was noted as poor and floppy, and his head was described as molded with a large amount of caput and bruising. Pediatrician Howard Gruber was called. At 11:30 p.m. the record indicates appellant's color was "pink without . . . oxygen." At 11:40 p.m. the ICN record indicates appellant was placed in a hood with blow-by oxygen. His color became duskier without blow-by oxygen, and grunting and flaring were noted. His tone and cry were poor.

Dr. Gruber examined appellant in the ICN around midnight. He noted that the medical chart revealed appellant had Apgar scores[1] of five at one minute and five minutes following birth, out of a possible score of ten, and was hypotonic. Upon Dr. Gruber's examination, appellant was alert and had good muscle tone. Gruber noted appellant had mild transient asphyxia and acidosis, and ordered treatment and tests. Gruber testified that on a scale of one to ten, with ten being most ill, appellant was a three.

Approximately 14 hours after birth appellant began having seizures and was transferred to Kaiser Hospital in Oakland later that day.

---

[1]The Apgar score is a standardized method for evaluating newborns in the delivery room. The test rates five categories: pulse, respiratory effort, tone, reflex and color.

It is undisputed that appellant sustained an injury to the left side of his brain resulting in right hemiparesis (left-sided motor problems) consistent with cerebral palsy, a seizure disorder, learning disabilities and visual, perceptual and attentional deficits with related cognitive problems. Appellant's experts opined that he suffered brain damage caused by lack of oxygen and/or ischemia (lack of blood flow) during labor and delivery, probably within one or two hours prior to delivery. Respondents' experts agreed there was evidence of mild transient hypoxia at birth, but opined that it was not severe enough to cause brain damage. Instead, they attributed the brain damage to a stroke that occurred sometime prior to labor.

As to Alta Bates, appellant contended the labor and delivery nurses breached the standard of care by failing to: (1) Insist on EFM instead of Doppler auscultation; (2) properly perform Doppler monitoring; (3) recognize Lis's labor was abnormal; and (4) render sufficient amounts of oxygen after birth. As to Hoag and Neff, appellant contended they failed to recognize an abnormal labor and take special precautions or intervene to advance delivery.

After appellant rested his case, Alta Bates successfully moved for nonsuit on the grounds that (1) appellant failed to present any evidence of the standard of care for labor and delivery nurses in the Bay Area in 1981, (2) the nurses breached this standard, or (3) their negligence proximately caused appellant's injury. Additionally, Alta Bates contended appellant failed to present any evidence that its nurses were negligent regarding their resuscitation efforts.

DISCUSSION

I

Appellant contends the court erred in granting nonsuit for Alta Bates because there was sufficient evidence to sustain his cause of action.

■ "In an appeal from a judgment of nonsuit, the reviewing court is guided by the same rule requiring evaluation of the evidence in the light most favorable to the plaintiff. 'The judgment of the trial court cannot be sustained unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law.' [Citations.] [¶] Although a judgment of nonsuit must not be reversed if plaintiff's proof raises nothing more than speculation, suspicion, or conjecture, reversal is warranted if there is 'some

substance to plaintiff's evidence upon which reasonable minds could differ . . . .' [Citations.] Only the grounds specified by the moving party in support of its motion should be considered by the appellate court in reviewing a judgment of nonsuit." (*Carson* v. *Facilities Development Co.* (1984) 36 Cal.3d 830, 839 [206 Cal.Rptr. 136, 686 P.2d 656].)

## A. *Standard of Care*

Appellant sought to establish the nursing standard of care in 1981 regarding fetal heart rate monitoring by Doppler auscultation, including when monitoring should begin, and its duration and frequency. ■ The standard of care in a medical malpractice case requires that medical service providers exercise that reasonable degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances. The standard of care against which the acts of a medical practitioner are to be measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony, unless the conduct required by the particular circumstances is within the common knowledge of laymen. (*Willard* v. *Hagemeister* (1981) 121 Cal.App.3d 406, 412 [175 Cal.Rptr. 365].) It is also established that a nurse's conduct must not be measured by the standard of care required of a physician or surgeon, but by that of other nurses in the same or similar locality and under similar circumstances. (See *Fein* v. *Permanente Medical Group* (1985) 38 Cal.3d 137, 150-151 [211 Cal.Rptr. 368, 695 P.2d 665]; *Fraijo* v. *Hartland Hospital* (1979) 99 Cal.App.3d 331, 341 [160 Cal.Rptr. 246].)

In arguing during trial how the standard of care had to be established, and by whom, the focus of attention became misdirected to the different standards for nurses and physicians. ■ Somewhere in the process the parties overlooked the fact that the standard of care determines, inter alia, the minimum level of care to which the patient is entitled. It is undisputed in this record that the purpose of fetal heart monitoring is to detect changes in the normal fetal heart rate indicative of fetal distress, and to thereby prompt additional measures to prevent injury or further damage to the fetus. Doppler monitoring is accomplished by listening and measuring at periodic intervals for a certain length of time, and may be performed by *either* physicians or nurses. Dr. Neff testified that the standard of care in 1981 for Doppler monitoring was to listen and measure through the contraction and for at least 30 to 40 seconds thereafter. Since this was the standard of care to which the patient was entitled, the hospital was required to provide it, and whether the monitoring was performed by a physician or a nurse was irrelevant, as either was qualified to perform that function. Consequently, the evidence establishes the appropriate standard of care, and the trial court's ruling to the contrary was erroneous.

## B. *Breach*

Toby Furash was Lis's labor and delivery nurse between 3 p.m. and appellant's birth at 11:06 p.m. She testified that during the second stage of labor she listened to the fetal heart rate "after every contraction," which was every three to four minutes. She would either listen for 15 seconds and multiply by 4, or would listen for a longer period. She testified she had difficulty recalling how she performed Doppler monitoring in 1981 and she probably did not listen through the contractions as often as present practices require.

Hoag testified it would be beneath the standard of care for a nurse to consistently listen to the fetal heart rate for only 15 seconds. He also testified that if Doppler monitoring did not encompass the contraction, a late deceleration in heart rate could be missed. Neff testified that listening for 15 seconds and multiplying by 4 would not be in and of itself beneath the standard of care. However, if a nurse did not listen through the contraction and for a period of time thereafter, she was likely to miss a late deceleration, which could be a sign of fetal distress if such decelerations were severe and sustained over a long period of time.

■ We conclude this evidence is sufficient to establish a breach of the standard of care. Furash testified that she listened *after* rather than during the contractions in the second stage of labor, the period of time in which the injury allegedly occurred. Further, she admitted listening for only 15 seconds at times, and could not state what percentage of time she listened in this abbreviated fashion. Despite Neff's testimony that while he was in the room Furash listened during contractions and for a period of time between contractions, the evidence reveals he was not present during all monitoring, and we must interpret the evidence most favorably to appellant and resolve all inferences and doubts in his favor. (*Carson* v. *Facilities Development Co.*, *supra*, 36 Cal.3d at p. 839.) Any disputed factual issues are for the trier of fact.

## C. *Proximate Cause*

■ In a medical malpractice action, the evidence must be sufficient to allow the jury to infer that in the absence of the defendant's negligence, there was a reasonable medical probability the plaintiff would have obtained a better result. (*Morgenroth* v. *Pacific Medical Center, Inc.* (1976) 54 Cal.App.3d 521, 533 [126 Cal.Rptr. 681]; see *Keen* v. *Prisinzano* (1972) 23 Cal.App.3d 275, 281 [100 Cal.Rptr. 82].) Appellant's experts testified that his brain damage was caused by hypoxia occurring during the second stage

of labor, probably one to two hours prior to delivery. Fetal distress occurred prior to or coincident with hypoxia, and such distress probably occurred 30 to 40 minutes before the onset of permanent brain damage. Repeated decelerations in the fetal heart rate occurring for 30 minutes to 1 hour would indicate fetal distress and would arouse concern of danger to the fetus. Proper Doppler monitoring would have detected late decelerations. Dr. Iffy testified that had fetal distress been detected and timely intervention occurred, appellant's brain damage would probably have been prevented.

From the foregoing evidence, the jury could have concluded that negligent monitoring failed to detect fetal distress during the relevant period prior to delivery and, as a result, no attempt was made to intervene to advance delivery prior to the onset of permanent brain damage. Alta Bates contends that Neff's repeated monitoring of the fetal heart rate negated appellant's assertion that Furash's monitoring was inadequate to detect fetal distress, since late decelerations do not signal the onset of hypoxia unless they recur over a prolonged period. However, this contention creates a factual dispute for the jury. Neff testified that between 8:15 p.m. and 10 p.m. he was in and out of Lis's room, and from 10:20 p.m. until appellant's delivery, he was either in the room or nearby. There is no evidence of the frequency of Neff's monitoring during the relevant time period.

Consequently, there was substantial evidence from which the jury could find that negligent monitoring caused appellant's injuries. Because appellant provided sufficient evidence on each element of his cause of action, the court erred in granting the hospital's motion for nonsuit.

II

Appellant next contends the court abused its discretion in excluding Dr. Barry Schifrin's opinion that the standard of care required Neff to recognize Lis's labor was abnormal. In his sworn expert witness declaration (Code Civ. Proc., § 2034, subd. (f)(2)), Hoag and Neff's counsel disclosed Schifrin as an OB/GYN expected to testify on the standard of care, damages and causation. Schifrin's curriculum vitae, attached to the declaration, established him as a nationally known OB/GYN practicing in Los Angeles County, with appointments in the field in California since 1973. Thereafter, he was deposed by appellant. On the fifth day of trial, in opposition to appellant's request that Schifrin's deposition be used in appellant's case-in-chief, respondents objected to appellant calling Dr. Schifrin as his own witness, contending Schifrin was their witness and it was unfair to permit appellant to introduce Schifrin's testimony in appellant's case-in-chief. Respondents assured the court that they would call Schifrin in their defense case, and that appellant

could cross-examine him at that time. Two weeks later, in a reversal of their previous position, respondents rested their defense and announced that Schifrin would not be called. Thereafter, appellant sought to read to the jury the following portion of Schifrin's deposition regarding his opinion that Neff breached the standard of care:

"Q. Do you believe that the standard of care in 1981 required that Dr. Neff have considered the potential for CPD [cephalopelvic disproportion] during the course of labor?

"A. Absolutely.

"Q. Do you believe that the standard of care required that he consider it?

"A. I don't want to get caught with the term CPD, but if we can agree [that] Dr. Neff had to recognize this as an abnormal labor, that the standard of care requires the recognition that this is an abnormal labor, whether you call [it] the potential for CPD or not, that is not the issue. The issue is he must recognize this is an abnormal labor.

"Q. So the standard of care required Dr. Neff to recognize this labor as having been an abnormal labor; is that correct?

"A. Absolutely."

The court excluded the proffered testimony because the record from the deposition did not reveal whether Schifrin had knowledge of the applicable standard of care in the community in 1981, which was the only objection respondents raised below. Appellant contends Schifrin's knowledge of the 1981 standard of care could be reasonably inferred from his deposition testimony that the standard of care required Neff to recognize Lis's labor as abnormal; and from his curriculum vitae showing he had been practicing medicine, teaching and writing in the field of OB/GYN in California since 1973.

Hoag and Neff's sworn witness declaration stated that Schifrin was sufficiently familiar with the action to provide meaningful testimony on the applicable standard of care. In addition, they conceded Schifrin was familiar with the standard of care and his qualification as an expert was not disputed. Their objection lay in the fact that during Schifrin's deposition appellant did not specifically ask him whether he was familiar with the standard of care in 1981, although it is obvious from the testimony that this was the period under discussion, and Hoag and Neff do *not* contend that Schifrin is not, in fact, qualified.

■ The party offering the expert must demonstrate that the expert's knowledge of the subject is sufficient, and the determinative issue in each case is whether the witness has sufficient skill or experience in the field so his testimony would be likely to assist the jury in the search for truth. The trial court will be deemed to have abused its discretion if the witness has disclosed sufficient knowledge of the subject to entitle his opinion to go before the jury. (*Jeffer, Mangels & Butler* v. *Glickman* (1991) 234 Cal.App.3d 1432, 1442-1443 [286 Cal.Rptr. 243].)

■ Having asserted Schifrin's qualification as an expert on the standard of care by sworn declaration, having conceded his qualifications at trial and having assured the court that they would produce Schifrin as a witness when appellant originally attempted to introduce his testimony, respondents could not fairly object when Schifrin's testimony was proffered by appellant. "The trial of a law suit is not a game where the spoils of victory go to the clever and technical regardless of the merits, but a method devised by a civilized society to settle peaceably and justly disputes between litigants. The rules of the contest are not an end in themselves." (*Simon* v. *City & County of San Francisco* (1947) 79 Cal.App.2d 590, 600 [180 P.2d 393].)

Early in the trial when appellant had sufficient time to secure Schifrin as a witness, respondents objected to appellant reading his deposition testimony on the ground that Schifrin was their witness and that they would call him during their case—they specifically represented to the court and to appellant that they would do so. Then, when the trial was nearly over, respondents advised appellant and the court that they were not calling Schifrin and, for the first time, objected to his testimony on technical grounds that they had to know were without support. Regardless of respondents' motives or reasons, the impact on appellant was the same: he was lulled into a false sense of security and deprived of the opportunity to present relevant and important evidence in support of his case.

We conclude that but for the court's erroneous exclusion of Schifrin's testimony, it is reasonably probable a result more favorable to appellant would have been reached in his case against Neff. Schifrin's opinion on abnormal labor went to a major issue in the case. Appellant's case against Neff was based on his failure to recognize Lis's abnormal labor and take special precautions or intervene to advance delivery. Thus, Schifrin's testimony was critical not only in proving appellant's case, but in rebutting respondents' theory that Lis's labor was normal. In addition, while appellant's expert, Dr. Iffy, testified that both the first and second stages of labor were marked by abnormal labor patterns due to protraction of labor, Schifrin expressly testified that the standard of care required Neff to recognize that

the labor was abnormal. Finally, since Schifrin was originally disclosed by Hoag and Neff as their expert, it is likely the jury would have given great weight to his testimony favoring appellant. For all these reasons, we conclude the court's erroneous exclusion of Schifrin's testimony was prejudicial. Because Schifrin's testimony did not concern Hoag's conduct, the error does not require reversal of the judgment in favor of Hoag.

### III-VIII*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment of nonsuit in favor of Alta Bates Hospital and the judgment in favor of Dr. Neff are reversed. The award of costs to Dr. Hoag is ordered modified, striking the costs for trial transcript preparation. The judgment in favor of Hoag is otherwise affirmed.

Appellant will recover costs on appeal against Alta Bates Hospital and Dr. Neff. Dr. Hoag shall recover his costs.

King, Acting P. J., and Low, J.,† concurred.

A petition for a rehearing was denied May 1, 1992, and respondents' petition for review by the Supreme Court was denied June 25, 1992.

*See footnote, *ante*, page 208.

†Retired Presiding Justice of the Court of Appeal, First District, sitting under assignment by the Chairperson of the Judicial Council.