Filed 3/30/21  Carrillo v. Alvarez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| KARLA CARRILLO, a Minor, etc., et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CARLOS ALVAREZ et al., <br><br> Defendants and Respondents. | F077422 <br><br> (Super. Ct. No. S-1500-CV-278424) <br><br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  David R. Lampe, Judge.

Saldo Law Group and Tyler B. Saldo; Chain Cohn Stiles and David K. Cohn; Ernst Law Group, Don A. Ernst and M. Taylor Ernst; Esner, Chang & Boyer and Andrew N. Chang for Plaintiffs and Appellants.

Cole Pedroza, Curtis A. Cole, Alysia B. Carroll, and Cassidy C. Davenport; Lebeau Thelen and Dennis R. Thelen for Defendants and Respondents.

Tucker Ellis and Traci L. Shafroth for California Medical Association, California Dental Association, California Hospital Association, California Academy of PAs, and the American Medical Association as Amici Curiae on behalf of Defendants and Respondents.

-ooOoo-

Plaintiffs Karla and Norma Carrillo[1] appeal from the Kern County Superior Court's February 21, 2018 judgment entered in favor of defendants Dr. Carlos Alvarez, Valley Medical Group, and Carlos Flores.  We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.      Plaintiffs' visit to Valley Medical Group

On October 12, 2011, Norma brought Karla—then 17 years old—to Valley Medical Group, a clinic owned by Alvarez.  Karla had been suffering intermittent headaches and a "hot" forehead for the past two or three days and had been treating her condition with ibuprofen.  In the examination room, Norma and Karla met Alfred Tobias, a Touro University (Touro) student enrolled in the school's physician assistant program.  He introduced himself as a "physician assistant student" and advised he was "on a clinical rotation"; would "do a history" and "physical exam" "with their permission"; and would present the information to his "preceptor or supervising clinician," who would then "do an independent exam" and "make the plan for the patient."  When Tobias asked "if [he had] their permission" to proceed, both Norma and Karla responded in the affirmative.

As reflected in a chart note prepared by Tobias, Karla stated she experienced "throbbing" "lateral-frontal" headaches "15 times a day."  Each episode would last "15 to 30 seconds."  Karla denied having any weakness; paresthesia; fever; chills; weight loss; earache; changes in vision or hearing; nasal drainage; sore throat; cough; shortness of breath; neck, chest, or back pain; nausea; or vomiting.  Tobias noted Karla was previously diagnosed with type 2 diabetes.  He did not perceive any acute distress.  Palpation of the head and neck did not elicit tenderness and Karla's neck exhibited full

---

[1]      In this opinion, where appropriate, we refer to a particular plaintiff by first name to avoid confusion.  No disrespect is intended.

range of motion. Her lungs were "[c]lear to auscultation bilaterally." Tobias observed a "[f]ast heartbeart" and possibly a "diastolic murmur." He did not make a diagnosis.

After Tobias left the examination room, he discussed his findings with Flores. Everything Tobias did at Valley Medical Group was under the direction of both Dr. Alvarez and Flores, a licensed physician assistant employed by Valley Medical Group. Tobias and Flores went over life-threatening illnesses that needed to be ruled out, including stroke, brain tumor, aneurysm, brain hemorrhage, and meningitis.

Thereafter, Flores evaluated Karla. She denied having any nausea, vomiting, or vision problems. Flores observed no distress. Karla's ears, eyes, nose, throat, and neck were normal. Nothing suggested an abnormality with her brain or nervous system. Flores checked Karla's heart and determined she had a benign venous murmur rather than a diastolic murmur. He concluded there was no risk of a life-threatening illness and diagnosed stress-induced tension headaches. The chart note was subsequently revised: "diastolic murmur" was changed to "venous murmur" and "tension headache [secondary] to stress" was added. Karla was instructed to take acetaminophen as needed but return to Valley Medical Group "in one week if [her] headaches become constant and/or worsen[]" and/or she "develops nausea, vomiting, photophobia, body aches, neck pain."

## II.    Bakersfield Memorial Hospital

For a two-week period following her visit to Valley Medical Group, Karla occasionally complained of headaches but felt better after ingesting acetaminophen. According to Norma, Karla otherwise appeared fine and went about her normal routine. She was able to walk, converse, eat, sleep, dress, attend school and church, and do homework without any apparent difficulty. As a result, Norma did not take Karla back to Valley Medical Group.

On October 27, 2011, Karla complained of light sensitivity for the first time. On October 29, 2011, she had a fever and her head "hurt more." Karla also experienced pain at the base of her head for the first time. On October 30, 2011, she had a fever again.

Then, while at church, Karla told Norma she "wasn't feeling well" and "was starting to see double." Karla was taken to Bakersfield Memorial Hospital, where she was seen by Dr. Peter Ellis, an emergency physician.

Karla told Ellis she "was having severe headaches" for two or three weeks that were "increasing in severity and frequency," becoming "almost constant" "for the last couple of days." She also complained of fevers, neck stiffness, vision problems, and bouts of confusion. Ellis conducted physical and neurological exams, both of which were normal. The results of a computerized tomography scan of the head were also normal. Ellis ordered a lumbar puncture. Before the procedure could be performed, Karla's pupils dilated and she "started thrashing her extremities . . . ." She then "settled into an episode where she was unresponsive, staring into space . . . ." Ellis administered Ativan, a medication used to treat seizures. While Karla "initially seemed to respond," she "went into the next altered state, which she never really recovered from." At trial, Ellis testified:

> "[Karla] became more agitated, more pupillary dilatation. At that time her eyes were doing what we call nystagmus, moving back and forth unpredictably. She was completely unresponsive to my questions, to her family, and also became very hyper-reflexive. Her reflexes were very twitchy. Just the generalized state of hyper-excitation of her nervous system that was difficult to explain."

Testing of the cerebrospinal fluid collected from the lumbar puncture indicated "an inflammatory process in the central nervous system, likely to be some type of meningitis." A magnetic resonance imaging scan showed two areas of infarction in the brain. Additional imaging taken on October 30, October 31, and November 11, 2011, demonstrated Karla sustained additional strokes. Ellis concluded the infarctions were the result of cocci meningitis. Karla has since been "functionally quadriparetic" with "some slight motion of her right hand and her right foot."

### III.   The lawsuit

Plaintiffs sued Alvarez, Valley Medical Group, and Flores for both medical negligence and general negligence.[2]  Plaintiffs alleged Flores negligently failed to diagnose and treat Karla's cocci meningitis and Alvarez and Valley Medical Group were vicariously liable.  Plaintiffs also alleged Alvarez and Valley Medical Group were directly liable for their failure to supervise Tobias.

### IV.   Defendants' demurrers

Defendants filed demurrers to the operative complaint.  They argued plaintiffs' cause of action for general negligence was superfluous.  The superior court agreed but overruled the demurrers.  It pronounced:

> "The defendants are correct that the [general negligence] cause of action pleaded in the [operative] [c]omplaint is surplusage.  This cause of action is redundant.  However, redundant matter is not reachable by demurrer, but instead by a motion to strike. . . .

> "The plaintiffs are incorrect that there are two causes of action stated.  The plaintiffs erroneously premised their argument on a perceived conceptual distinction between ordinary and professional negligence. . . .  There is but one cause of action for negligence stated in this complaint based upon the allegation that Karla . . . was misdiagnosed. . . .  [A]s to each of the defendants, the court will determine the scope of duty based upon the facts proven, and the court will likewise determine the basis by which ordinary prudence will be calculated and any defendant's conduct evaluated. . . .  In essence, in terms of the overall case itself, the plaintiffs have gained nothing by the court's order overruling the demurrers, nor have defendants lost anything."

---

[2]     Plaintiffs also sued Tobias and Touro.  Those parties reached a settlement prior to the presentation of evidence.

## V.  The Trial

### a.  Evidentiary rulings.

#### i.  *Testimony regarding clinical preceptorship agreement*

Touro and Valley Medical Group entered into a clinical preceptorship agreement on October 1, 2007.  The contract recitals read in pertinent part:

> "A.   . . . . [Touro] desires that its students (osteopathic medical students and physician assistant/master of public health students) obtain practical clinical experience . . . through participation in a clinical preceptorship program . . . .

> "B.   [Valley Medical Group] desires and deems it beneficial . . . to participate in the [clinical preceptorship] [p]rogram by providing practical clinical experience . . . for [Touro] students pursuant to the terms and conditions of this [a]greement."

Paragraphs 3.01 and 5.01 of the agreement specified Valley Medical Group "shall accept from [Touro] the mutually agreed upon number of students enrolled in the [p]rogram and shall provide said students with supervised clinical experience" and "students participating in the [p]rogram are in attendance for educational purposes," respectively. An attached "Clinical Experience Rules and Regulations" (boldface & some capitalization omitted) listed the several rules, including:

> "1.   Students shall be supervised by a licensed physician (D.O. or M.D.). [¶] . . . [¶]

> "4.   Students are to perform history and physical examination on patients as well as develop and discuss[] appropriate diagnostic studies to be ordered with the supervising physician.  Students should work with their supervisi[ng] physician in arriving at a final diagnosis and development and implementation of the treatment plan.  [¶] . . . [¶]

> "6.   . . . The histories prepared by and the physical examinations performed by the students must be reviewed by the supervising physicians and be reviewed periodically by the preceptor and student. . . .  [¶] . . . [¶]

6.

"8.    Students shall not order any examinations, tests, medications or procedures for any patients.  Students shall not write prescriptions for medicine, devices or anything requiring the authority of a licensed physician."

In a motion in limine, defendants asked the superior court to preclude both sides "from attempting to elicit any testimony at the time of trial concerning the contractual agreement between Touro . . . and Valley Medical Group . . . ."  They emphasized, inter alia, neither Karla nor Norma was "a signatory to the contract," "assigned the contract," or "a third[-]party beneficiary of the contract."  In their opposition, plaintiffs cited *Biakanja v. Irving* (1958) 49 Cal.2d 647 (*Biakanja*) for the proposition defendants could still "be held liable to a third person not in privity."  The court "ordered that . . . evidence be received . . . in an Evidence Code section 402 hearing.[3]"

At a section 402 hearing, Tracey Del Nero, Touro's clinical coordinator, testified the purpose of the agreement was "to provide educational clinical exposure for students enrolled within the [physician assistant] program . . . ."  She detailed:

"Clinical education is the cornerstone of being able to take didactic information and to be able to apply it.  It's their practice time to work through the steps necessary to make clinical reasoning decisions in . . . various settings, from inpatient/outpatient, to gain the skills and ability to apply the didactic knowledge that they learned in the didactic year.  It is basically like a mock practice period where they run through the skills, practice their skills, verify with the . . . licensed clinician that their clinical reasoning is appropriate or rectify deficiencies so they can learn.  [¶] . . . [¶]

". . . .  In order for students . . . or any . . . person to apply to sit for the national boards and ultimately obtain state license, they must graduate from an . . . accredited [physician assistant] program, and . . . clinical rotations are a specific . . . curriculum requirement by those standards."

When asked whether the agreement "intended for a Touro . . . student to provide actual hands-on medical care to patients of Valley Medical Group," Del Nero answered:

---

**3**     Henceforth, for brevity, we refer to such hearings as section 402 hearings.

"Absolutely not.  As students they're legally not allowed to.  They're there for educational purposes only, to practice the skills that they have been trained in the didactic year in a clinical setting and to continue their education in the application of specific medical knowledge to a specific patient situation."

When asked about "[her] understanding of who is allowed to be a student physician assistant preceptor in 2011," Del Nero answered:

"The primary preceptor was a physician, either an M.D. or D.O., but that physician is able to delegate services to any colleagues under his supervision or within his same practice.  So it can be a resident.  It can be an intern.  It can be a [physician assistant], a[] [nurse practitioner], or any other licensed clinical provider."

Alvarez concurred the intent of the agreement was to provide physician assistant students with a clinical training opportunity.  When asked whether "the dominant purpose of the agreement was related in any way, shape, or form to patient safety because of patient care rendered by a student trainee," he answered, "Yes."

Following the section 402 hearing, the court granted defendants' motion.  It reasoned:

"[T]he court notes that the reason for the *Biakanja* rule arises when an injured plaintiff seeks redress in negligence when there is otherwise no duty except that which may arise from a contract where the plaintiff is a third party not in privity. . . .  [¶]  There is no question in this case that there is privity between [Karla] and Valley Medical [Group] (and Defendant Dr. Alvarez, as well as Defendant Mr. [Flo]res) by virtue of the patient/medical provider (physician) relationship.  The law need not resort to the issue of duty arising from any third[-]party contract with respect to these defendants.  The law imposes a duty upon medical professionals to possess and exercise, in both diagnosis and treatment, the reasonable degree of knowledge and skill which is ordinarily possessed and exercised by other members of the profession in similar circumstances. . . . Valley Medical [Group] (and its professional providers) cannot diminish this legal duty to the patient by means of any third[-]party contract.  No third[-]party contract can add to this duty.  For these reasons, the court finds that the contract between Touro . . . and Valley Medical [Group] is irrelevant on the question of the negligence of Valley Medical [Group] and its professional providers.  The *Biakanja* rule is inapplicable to these defendants.  If these

8.

defendants failed in their duty as set forth above, and that failure was a substantial factor in causing the Plaintiff injury, then they are liable in negligence."

ii. *Plaintiffs' experts' opinions regarding standard of care*

Plaintiffs sought to introduce the opinions of Dr. Michael Ritter, Dr. Royce Johnson, and Dr. Howard Pitchon that the standard of care for medical practitioners required Alvarez to supervise physician assistant students such as Tobias.

1. Dr. Ritter

At his deposition, Ritter—a board-certified emergency physician—opined Alvarez and Valley Medical Group violated the standard of care with regard to "[physician assistant] supervision" "based on the state law as well as [the] agreement that they have with Touro . . . ."  Pertaining to his understanding of the law, he explained:

> "I used to be the chair of the interdisciplinary committee, so I did the oversight for all the credentialing for the [physician assistants] . . . .  So I knew that there was [a] statute out there for [physician assistants] about the supervision of [physician assistant] students, that it had to be done by a physician.  But I'm not a lawyer, so I don't know where to look for all that stuff.
>
> "So when I spoke with [plaintiffs' counsel], I said, '. . . I know these things are out there.  Can you help me find them so we can put it together?'  Because it's my understanding that as a [physician assistant] student, you need to be supervised by a physician and not a [physician assistant]."

Ritter added he had experience supervising physician assistants but not physician assistant students.

The superior court "fully read" Ritter's deposition testimony and pointed out "a great deal of [his] opinion" was "based upon his reading of the contract [between Touro and Valley Medical Group] and his understanding of the law," which was "not proper foundation for an expert's testimony."  In addition, "[t]here was no independent basis for [Ritter's] expression of a standard of care opinion on that subject . . . ."  The court

9.

advised a section 402 hearing should be conducted to "resolve the foundational questions" and avoid objections.

During trial, outside the presence of the jury and before Ritter was called to the stand, the following colloquy transpired:

> "THE COURT:  . . . I wanted to make doubly sure . . . , just so that no controversy erupts in the presence of the jury to the prejudice of anyone or everyone, . . . there's going to be no opinions of the witness elicited on the subject matter of the management of Tobias as an intern or student [physician assistant] with Valley Medical [Group], Dr. Alvarez, or Mr. Flores.  If . . . that is going to be a subject and it's going to be objected to, I'd just like to get those cards on the table so I can deal with it.
>
> "[PLAINTIFFS' COUNSEL]:  . . . .  There will be no opinions asked about Tobias or Touro . . . .  And if it gets to that point . . . , I will not do it in front of the jury.  I will request [a section 402] hearing, but at this point in time that is not my intent, and I do not intend to ask any questions with regard to standard of care of Tobias or Touro . . . ."

After a recess taken in the middle of the defenses' cross-examination of Ritter, outside the presence of the jury, plaintiffs' counsel requested a section 402 hearing "on the issue of Dr. Ritter concerning . . . his opinions with regard to supervision of . . . Tobias."  The court rejected the request as untimely.

### 2.  Dr. Royce Johnson

At his deposition, Royce Johnson[4]—a board-certified internist and infectious disease specialist—testified he believed the law did not allow a physician assistant to supervise a physician assistant student and Alvarez should have "directly supervise[d] the care of the patient . . . himself."  Royce Johnson admitted he "d[id]n't know th[e] law" and relied on information given to him by plaintiffs' counsel.  He also stated he "d[id]n't have any significant experience with physician assistant students."

---

**4**     As two different physician expert witnesses by the name of Johnson testified in this case, we use their first and last names to distinguish between them.

The superior court "fully read" Royce Johnson's deposition testimony and noted Royce Johnson "rendered an opinion . . . based on the law that he was given by counsel." Furthermore, Royce Johnson "has never supervised . . . a physician assistant trainee." The court advised a section 402 hearing should be conducted to "resolve the foundational questions" and avoid objections.

At a section 402 hearing, Royce Johnson testified:

"I think it's unacceptable for a [physician assistant] to train a [physician assistant] student in the sense that the training and experience and nuance of medical care is better known by a[ physician]. They'd be in a better position to so train a [physician assistant] student."

Royce Johnson reiterated he never "actually dealt with physician assistant trainees directly."

On cross-examination, the following colloquy transpired:

"Q. As I understand it, you would claim significant experience as a practicing physician with medical students and residents but only limited experience with licensed [physician assistant]s. That's your own self-description of your experience with licensed [physician assistant]s.

"A. I think that's a fair statement. [¶] . . . [¶]

"Q. . . . [Y]ou described yourself . . . as saying that you were not holding yourself out as an expert on the law; is that right?

"A. I'm not an expert on the law. [¶] . . . [¶]

"Q. So you told us that you thought that this circumstance, that is, having a student trainee see a patient without a physician in the room, it violated the standard of care . . . , but you thought it was more of a legal than a medical opinion; isn't that your under-oath testimony?

"A. I think I still think that. . . . [¶] . . . [¶] . . . I think it is more of a legal than a medical issue, yes. [¶] . . . [¶]

11.

"Q.     And other than [plaintiffs' counsel] holding the [Physician Assistant Practice Act][5] guidelines in front of you at the deposition I took from you a year ago, . . . did you even know there was such a set of statutory law in California called [the Physician Assistant Practice Act]?

"A.     . . . I'd never read it, but I was aware there was such a law . . . .

"Q.     . . . You had no independent knowledge of your own, as a practicing physician of many years, about these statutory provisions?

"A.     I was aware there was a statute, but I had never read it. [¶] . . . [¶]

"Q.     . . . [Y]ou would not self-describe yourself to the [c]ourt as an expert or an authority on physician assistant practice?

"A.     Okay.  I'll agree with that."

Following the section 402 hearing, the court sustained defendants' objection:

"This issue was whether or not . . . Dr. [Royce] Johnson had foundation for an expert opinion regarding essentially the method of supervision or administration of Mr. Tobias acting as a student trainee, and I find that there is insufficient foundation for that opinion.  He may hold an opinion, but it is not the type of opinion that carries with it the foundation to express that opinion to the jury . . . .

"Dr. [Royce] Johnson is imminently qualified as a physician.  By his own admission, he's not an expert in the law.  He's not an expert in contract.  He has not had any substantial experience administering a physician assistant program, administering or supervising the way in which physician assistant trainees are taught . . . ."

### 3.  Dr. Pitchon

During his deposition, Pitchon—a board-certified internist and infectious disease specialist—testified he never supervised physician assistants or worked with another physician who supervised physician assistants.  He was also unfamiliar with any laws

---

[5]     See Business and Professions Code section 3500 et seq.

relating to the duties and responsibilities of such supervision. Nonetheless, Pitchon opined Alvarez breached the standard of care because he did not treat Karla himself:

> "[W]e've got . . . a [physician assistant] trainee, with very little knowledge of clinical medicine. We have a [physician assistant] that . . . has some knowledge of medicine but certainly not complex, and . . . I take the position it's your responsibility to . . . see patients. I don't think the [physician assistant] is a substitute for a physician, who's got clinical knowledge and education beyond the [physician assistant] level."

Pitchon stated he "ha[d] no idea what the laws are and the contracts and all this other stuff."

During trial, outside the presence of the jury defendants objected to Pitchon's opinion, asserting lack of foundation. The superior court sustained defendants' objection in view of Pitchon's concession he had "no knowledge of the requirements for a physician supervising a physician assistant."

b. Trial testimony.

i. *Plaintiffs' experts*

Ritter opined the medical treatment received by Karla on October 12, 2011, fell below the standard of care. He identified several "red flags" in the chart note: the onset of new headaches, which was a possible early symptom of meningitis; Karla's elevated heart rate; and her type 2 diabetes. In addition, Ritter deemed the chart note deficient because, among other things, there was no family history recorded; there was no indication when Karla last ingested ibuprofen, which could have "mask[ed] a fever"; and there was no "pain scale from zero to ten" describing the severity of the headaches. Based on the findings, Ritter believed Karla should have been referred to the emergency room immediately for further testing, which would have revealed cocci meningitis.

Likewise, Royce Johnson opined Karla's treatment fell below the standard of care. He believed the presentation of headaches "was a red flag" "for a multiplicity of diseases"—including meningitis—that "deserved much more considered attention and

13.

evaluation on an expeditious basis." Johnson thought the findings warranted an MRI scan and a lumbar puncture.

ii. *Defendants' experts*

1. Dr. Richard Johnson

Richard Johnson, a board-certified family practitioner, testified he examines a physician assistant's work "under the standard of what a board[-]certified or a licensed physician would provide at that time." He reviewed the chart note prepared by Tobias, found it "very comprehensive and thorough . . . for a headache complaint," and "couldn't see anything . . . where [he] could glean any sort of breach of the standard of care." Richard Johnson clarified:

> "[The chart note]'s very thorough. It involves the issues that one is primarily focusing on, the headache, as well as many others. You wouldn't have to look at all these organs when you're just looking at a specific headache as a problem, which they did, which is thorough. But the major issues are the neurologic exam, which is normal. So there's no focal neurologic findings.
>
> "The person's vital signs are certainly appropriate for a person this age with a headache. There's no evidence of infection. The patient's neck doesn't show any signs of meningitis. The patient's . . . not in any acute distress, which is actually a critical issue for headaches. If you have a headache patient who is in acute distress, that means something is different than someone who has a headache of a historical nature. So, yes, I mean, all of the issues that one tends to focus on are certainly covered in this examination."

Regarding the chart note's revision, i.e., "diastolic murmur" was changed to "venous murmur," Richard Johnson remarked:

> "That told me that Mr. Flores was pretty thorough in reviewing the student's history as well as reviewing the student's physical examination, because he obviously had to listen to the heart again to come to make that determination that this is not a diastolic murmur; this is a venous murmur."

Richard Johnson also opined the discharge instructions met the standard of care.

14.

## 2. Dr. Michael Forman

Forman—a board-certified emergency physician—testified Karla's evaluation satisfied the standard of care. He stated:

> "I don't see anything in her presentation . . . that would suggest to a reasonable practitioner that they should test her, be it imaging studies, certainly not a spinal tap, any of that. I don't see anything there that moves me at all in that direction. I would feel very, very comfortable sending her out with symptomatic treatment and instructions to come back again if it gets worse. Nothing is a hundred percent; so we give those precautions to patients, just like were given in this case."

### c. Plaintiffs' proposed jury instruction.

Plaintiffs submitted the following modified CACI No. 418 (Presumption of Negligence per se):

> "[California Code of Regulations, title 16,] section 1399.536[, former subdivision (a)(1)] states:

> "Preceptors participating in the preceptorship of an approved program shall: [¶] . . . [b]e . . . licensed physician[s] who [are] engaged in the practice of medicine which practice [is sufficient to] adequately expose[] preceptees to a full range of experience. The practice need not be restricted to an office setting but may take place in license[d] facilities, such as hospitals, clinics, etc.

> "If you decide

> > "1. That . . . Alvarez and/or Valley Medical Group violated this law and

> > "2. That the violation was a substantial factor in bringing about the harm, then you must find that . . . Alvarez and/or Valley Medical Group was negligent.

> "If you find that . . . Alvarez and/or Valley Medical Group did not violate this law or that the violation was not a substantial factor in bringing about the harm [or if you find the violation was excused], then you must still decide whether . . . Alvarez and/or Valley Medical Group was negligent in light of the other instructions."

15.

The superior court rejected the proposed instruction. It reasoned:

"Plaintiff[s] argue[] that the . . . instruction should be given because California Code of Regulations, title 16, section 1399.536, at the time in question, required that only licensed physicians be preceptors to physician assistant trainees. Plaintiff[s'] theory is that physician assistant trainee Tobias was permitted to perform an evaluation of [Karla] by himself at the time of her presentation on October 1[2], 201[1]. Plaintiff[s'] theory is that Dr. Alvarez should have been present during the examination, or, at least, that Dr. Alvarez should have been the person to see the patient with or after Tobias as a result of this regulation. [¶] . . . [¶]

"The court finds that [Karla]'s injury, that is, vasculitis from cocci meningitis causing cerebral infarction, . . . is not the kind of occurrence that th[is] regulation[] . . . w[as] designed to prevent. The court also finds that [Karla] is not within the class of persons th[is] regulation[] . . . was intended to protect.

"[California Code of Regulations, title 16, s]ection 1399.536 is not designed to ensure that patients receive a physician's evaluation, diagnosis and treatment plan. That regulation is intended to ensure that physician assistant trainees receive appropriate training. The court notes the provision of this regulation which states its intent that a preceptorship be provided which 'adequately exposes [*sic*] preceptees to a full range of experience' and that it 'shall be the responsibility of the approved program [of instruction] that preceptors comply with the foregoing requirements.' The regulation does not add to the duty of a physician to ensure that the physician's pat[i]ents receive adequate evaluation, diagnosis and treatment within the standard of care. The duty of the physician to ensure these basic matters is not the subject matter of the regulation. . . ."

d.      Verdict.

As reflected in a special verdict form, the jury concluded Flores had not been "negligent in the diagnosis or treatment of [Karla]." Accordingly, the jury did not reach the issue of causation.

## DISCUSSION

On appeal, plaintiffs make several contentions. First, "the trial court erred prejudicially by ruling in limine that as a matter of law, the contract between [Valley Medical Group and Touro] did not create a separate duty on the part of Dr. Alvarez to

16.

directly supervise Tobias, the [physician assistant] student." (Some capitalization omitted.) Second, "the trial court erred in precluding [plaintiffs'] retained expert witnesses from opining that the standard of care required Dr. Alvarez to supervise [physician assistant] students such as . . . Tobias." (Some capitalization omitted.) Finally, "the trial court erred prejudicially in refusing to instruct the jury that Alvarez/[Valley Medical Group] could be directly liable for [Karla]'s injuries under a negligence per se theory based on Alvarez's violation of a state regulation that requires licensed physicians to supervise [physician assistant] students like . . . Tobias." (Some capitalization omitted.) We reject these contentions.

"Generally, 'negligence' is the failure to exercise the care a reasonable person would exercise under the circumstances. [Citation.] Medical negligence is one type of negligence, to which general negligence principles apply. [Citations.]" (*Massey v. Mercy Medical Center Redding* (2009) 180 Cal.App.4th 690, 694.) "A necessary element of any cause of action for negligence is . . . the existence of a duty of care which defendant owed to the plaintiff." (*Rainer v. Grossman* (1973) 31 Cal.App.3d 539, 542.) "In the usual case of medical malpractice the duty of care springs from the physician-patient relationship . . . ." (*Id.* at p. 543.) "When a physician-patient relationship exists, 'the patient has a right to expect the physician will care for and treat him with proper professional skills and will exercise reasonable and ordinary care and diligence toward the patient [citation].' [Citation.]" (*Alexander v. Scripps Memorial Hospital La Jolla* (2018) 23 Cal.App.5th 206, 235; see *Alef v. Alta Bates Hospital* (1992) 5 Cal.App.4th 208, 215 (*Alef*) ["The standard of care in a medical malpractice case requires that medical service providers exercise that reasonable degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances."].)

"Under the common law doctrine of respondeat superior, a principal or employer is vicariously liable for the acts of an agent or employee committed in the course of employment." (*Lathrop v. HealthCare Partners Medical Group* (2004) 114 Cal.App.4th

17.

1412, 1421, fn. omitted; see Bus. & Prof. Code, § 3502, subd. (a)(1) ["[A] [physician assistant] may perform medical services as authorized by this chapter if . . . . [¶] . . . [t]he [physician assistant] renders the services under the supervision of a licensed physician . . . ."]; Bus. & Prof. Code, § 3501, subd. (f)(1) [" 'Supervision' means that a licensed physician . . . oversees the activities of, and accepts responsibility for, the medical services rendered by a physician assistant. . . ."].)

Since the jury returned a verdict that Flores, a licensed physician assistant employed by Valley Medical Group, was not negligent in the diagnosis or treatment of Karla, neither Alvarez nor Valley Medical Group could be held vicariously liable for medical malpractice under the doctrine of respondeat superior.

## I.     *Biakanja*

The parties did not dispute that Alvarez owed a duty of care to Karla by nature of the physician-patient relationship.  Plaintiff's argue, however, that the superior court erroneously concluded "a *Biakanja* theory of liability [a duty of care based on the contract] . . . is viable *only* 'when there is otherwise no duty' " and, in this case, "there was no need to 'resort to the issue of duty arising from any third[-]party contract.' " Defendants counter that, "even if the *Biakanja* factors . . . applied in this case, an additional duty [did] not arise from the contract" between Valley Medical Group and Touro because (1) the intent of the contract was to provide educational clinical exposure for students, not to provide a benefit to patients; (2) the harm to a patient was not foreseeable as the students were not allowed to provide medical care; (3) it is speculation to conclude that if Alvarez had personally examined Karla, he would have ordered more diagnostic testing; and (4) no moral blame can be assigned to Alvarez because, although Alvarez was the primary preceptor, he appropriately delegated some of his preceptorship duties to Flores, a licensed clinical provider, and his doing so is not the reason additional diagnostic tests were not ordered.

"A trial court's ruling on an in limine motion is generally reviewed for abuse of discretion. However, review is de novo when the issue is one of law." (*Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260, 1277.) As noted, a duty of care is an essential element of any negligence claim. (*Rainer v. Grossman*, *supra*, 31 Cal.App.3d at p. 542.) Whether such a duty exists "is a question of law." (*Ibid*.)

" 'A duty may arise through statute, contract, or the relationship of the parties.' [Citations.]" (*Lichtman v. Siemens Industry Inc.* (2017) 16 Cal.App.5th 914, 920, fn. omitted.) "A duty running from a defendant to a plaintiff may arise from contract, even though the plaintiff and the defendant are not in privity." (*Id.* at p. 921, fn. omitted.) "Under these circumstances, the existence of a duty is not the general rule, but may be found based on public policy considerations." (*Ibid*.) "The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." (*Biakanja*, *supra*, 49 Cal.2d at p. 650; see *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 779 ["[T]he question of 'the closeness of the connection between the defendant's conduct and the injury suffered' [citation] is strongly related to the question of foreseeability itself."].)[6]

---

[6] Division Five of the Second Appellate District recognized:

"*Biakanja* involved economic losses only, but the evolution in legal reasoning that allowed the *Biakanja* court to permit a plaintiff with only economic losses to recover for negligent performance of a contract where the plaintiff and defendant are not in privity was based on case law that permitted a personal injury plaintiff not in privity with the defendant to

19.

Assuming, arguendo, *Biakanja* applies to the instant case, we conclude the totality of the *Biakanja* factors weigh against deriving a duty of care to plaintiffs from the agreement between Touro and Valley Medical Group.

First, as shown by the terms of the contract and the testimonies of Del Nero and Alvarez, the " 'end and aim' of the transaction" (*Biakanja*, *supra*, 49 Cal.2d at p. 650) was to provide a number of Touro's physician assistant students with supervised clinical experience, a prerequisite for state licensure. Because these students were "in attendance for educational purposes," they could not render medical care: they were prohibited from finalizing diagnoses and treatment plans; "order[ing] any examinations, tests, medications or procedures for any patients"; and "writ[ing] prescriptions for medicine, devices or anything requiring the authority of a licensed physician." Any assignments involving direct communication with patients—e.g., preparing histories, performing physical examinations—had to be reviewed by a preceptor. Though Alvarez affirmed the "dominant purpose" of providing clinical training to physician assistant students was "related" to patient care and safety, this demonstrated—at most—"any potential [impact] to the plaintiff from the performance of the contract was . . . a collateral consideration of the transaction . . . ." (*Ibid*.; see *Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co.* (2002) 27 Cal.4th 705, 715.)

In 2011, when this case arose, it would not have been unreasonable for physicians to entrust actual physician assistants with the education and training of prospective physician assistants. The pertinent regulation called for "[p]receptors participating in the preceptorship of an approved program" to "[b]e licensed physicians." (Cal. Code Regs., tit. 16, former § 1399.536, subd. (a)(1), as amended Dec. 21, 2000; see Bus. & Prof. Code, § 3510.) Yet, the California Legislature also "encourage[d] the utilization of

---

recover." (*Lichtman v. Siemens Industry Inc.*, *supra*, 16 Cal.App.5th at p. 921, fn. 4.)

physician assistants by physicians" to address "the growing shortage and geographic maldistribution of health care services" in the state, namely "by enabling [physicians] to delegate health care tasks to qualified physician assistants where this delegation is consistent with the patient's health and welfare and with the laws and regulations relating to physician assistants." (Bus. & Prof. Code, former § 3500, as amended by Stats. 1996, ch. 454, § 1.) The Legislature also sought the "innovative development of programs for the education, training, and utilization of physician assistants." (*Ibid*.)

Moreover, the aforementioned regulation was amended in 2013 to expressly permit physician assistants to serve as supplemental preceptors. (See Cal. Code Regs., tit. 16, § 1399.536, subds. (a)(1), (c).) Along with negating the moral blameworthiness of delegating preceptorship responsibilities, this revision obviates any need to impose legal culpability on this activity to advance the policy of preventing future harm. (See *Cabral v. Ralphs Grocery Co.*, *supra*, 51 Cal.4th at pp. 781-782 ["The overall policy of preventing future harm is ordinarily served, in tort law, by imposing the costs of negligent conduct upon those responsible. The policy question is whether that consideration is outweighed, for a category of negligent conduct, by laws or mores indicating approval of the conduct or by the undesirable consequences of allowing potential liability."].)

In arguing for a duty of care per *Biakanja*, plaintiffs argue the foreseeability of a patient being misdiagnosed if a physician assistant student is not directly supervised by a physician. Foreseeability of harm, though important, is one of several factors to be weighed in a *Biakanja* analysis and is not dispositive. Additionally, a physician assistant student like Tobias cannot make a diagnosis under the terms of the clinical preceptorship agreement. Thus, an accusation of misdiagnosis necessarily focuses on whether the student's preceptor—a physician or agent thereof—breached the duty of care arising from the physician-patient relationship. Here, the jury answered that question in the negative.

21.

## II. Plaintiffs' experts' opinions regarding the supervision of physician assistant students

"The standard of care against which the acts of a medical practitioner are to be measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony, unless the conduct required by the particular circumstances is within the common knowledge of laymen." (*Alef*, *supra*, 5 Cal.App.4th at p. 215.) "In order to testify as an expert in a medical malpractice case, a person must have enough knowledge, learning and skill with the relevant subject to speak with authority, and he or she must be familiar with the standard of care to which the defendant was held." (*Avivi v. Centro Medico Urgente Medical Center* (2008) 159 Cal.App.4th 463, 467.) Because the standard of care in a medical malpractice case "requires that medical service providers exercise that reasonable degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances" (*Alef*, *supra*, 5 Cal.App.4th at p. 215), "[t]he test for determining familiarity with the standard of care is knowledge of similar conditions" (*Avivi*, *supra*, at p. 470). " '[The expert] must have had basic educational and professional training as a general foundation for his testimony, but it is a practical knowledge of what is usually and customarily done by physicians under circumstances similar to those which confronted the defendant charged with malpractice that is of controlling importance in determining competency of the expert to testify to the degree of care against which the treatment given is to be measured.' " (*Huffman v. Lindquist* (1951) 37 Cal.2d 465, 478.)

"[T]he qualification of an expert witness requires exercise of trial court discretion . . . ." (*Avivi v. Centro Medico Urgente Medical Center*, *supra*, 159 Cal.App.4th at p. 472.) "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' [Citation.]" (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747,

773.) Ultimately, a reviewing court is "required to uphold [a discretionary] ruling if it is correct on any basis, regardless of whether such basis was actually invoked." (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32, citing *Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329.)

In the instant case, Royce Johnson disclosed he never "actually dealt with physician assistant trainees directly." Pitchon revealed he never supervised physician assistants, let alone physician assistant students. Even assuming, arguendo, plaintiffs' counsel's request for a section 402 hearing with respect to Ritter should have been granted, the record demonstrates Ritter never supervised physician assistant students. Since these expert witnesses did not have any experience overseeing physician assistant students, it cannot be deemed irrational for a court to conclude they were not competent to testify as to " 'what is usually and customarily done by physicians' " in that situation (*Huffman v. Lindquist*, *supra*, 37 Cal.2d at p. 478) and preclude opinions on the matter.

## III.  Plaintiffs' proposed negligence per se instruction

"The negligence per se doctrine, as codified in Evidence Code section 669, creates a presumption of negligence if four elements are established:  '(1) the defendant violated a statute, ordinance, or regulation of a public entity; (2) the violation proximately caused death or injury to person or property; (3) the death or injury resulted from an occurrence of the nature of which the statute, ordinance, or regulation was designed to prevent; and (4) the person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted.' [Citation.]  The first two elements are questions of fact, while the latter two are questions of law.  [Citation.]" (*Spates v. Dameron Hospital Assn.* (2003) 114 Cal.App.4th 208, 218.)  " 'The burden is on the proponent of a negligence per se instruction to demonstrate that these elements are met.' [Citation.]" (*Taulbee v. EJ Distribution Corp.* (2019) 35 Cal.App.5th 590, 596.)

"In considering whether [plaintiffs' requested] instruction on negligence per se should have been given as requested in the circumstances of this case, we first decide as questions of law under Evidence Code section 669 whether [Karla]'s injuries . . . 'resulted from an occurrence of the nature [that] the . . . regulation[] [was] designed to prevent' and whether [Karla] 'was one of the class of persons for whose protection the . . . regulation[] [was] adopted.' [Citations.]" (*Norman v. Life Care Centers of America, Inc.* (2003) 107 Cal.App.4th 1233, 1246-1247.) Here, neither element is satisfied. Prior to 2013, California Code of Regulations, title 16, section 1399.536, subdivision (a)(1) read:

> "Preceptors participating in the preceptorship of an approved program shall: [¶] . . . [b]e licensed physicians who are engaged in the practice of medicine which practice is sufficient to adequately expose preceptees to a full range of experience. The practice need not be restricted to an office setting but may take place in licensed facilities, such as hospitals, clinics, etc."

Subdivision (b) added:

> "It shall be the responsibility of the approved program to assure that preceptors comply with the foregoing requirements."

As written, this provision did not concern the prevention of patient injuries resulting from faulty medical evaluations, diagnoses, or treatments. Rather, it was designed to ensure physician assistant students participating in a preceptorship program would be "adequately expose[d] . . . to a full range of experience."

## IV. Amicus curiae brief

The California Medical Association, California Dental Association, California Hospital Association, California Academy of PAs, and American Medical Association filed an amicus curiae brief in support of defendants. The brief rehashes some of defendants' points but also raises new arguments. " 'An amicus curiae ordinarily must limit its argument to the issues raised by the parties on appeal, and a reviewing court need not address additional arguments raised by an amicus curiae.' [Citation.]" (*Dignity*

24.

*Health v. Local Initiative Health Care Authority of Los Angeles County* (2020) 44 Cal.App.5th 144, 166.)  We therefore decline to address these new arguments.

## **DISPOSITION**

The judgment of the superior court is affirmed.  Costs are awarded to defendants Dr. Carlos Alvarez, Valley Medical Group, and Carlos Flores.


DETJEN, J.

WE CONCUR:


POOCHIGIAN, Acting P.J.


MEEHAN, J.