Filed 9/21/21  Valderrama v. Beautologie Cosmetic Surgery CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| HENRY VALDERRAMA II, Individually and as Successor in Interest, etc. et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>BEAUTOLOGIE COSMETIC SURGERY, INC., et al.,<br><br>    Defendants and Respondents. | F079565<br><br>(Super. Ct. No. BCV-17-101520)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  David R. Lampe, Judge.

Marderosian & Cohen, Michael G. Marderosian and Heather S. Cohen for Plaintiffs and Appellants.

Cole Pedroza, Kenneth R. Pedroza, Michael A. Carin; Lebeau Thelen and Dennis R. Thelen for Defendants and Respondents.

-ooOoo-

After undergoing cosmetic surgery which included an abdominoplasty, Melani Valderrama experienced a cough and low-grade fever that lasted several days.  On the fourth day following surgery, her husband Henry Valderrama telephoned and spoke with

the surgeon, Zach Barnes, M.D., to report his wife's symptoms. Dr. Barnes did not take or recommend any action at that time, since the reported symptoms did not seem unusual. Twelve hours later, Melani Valderrama died from a pulmonary embolism. A lawsuit was filed by Henry Valderrama and the three surviving minor children (together plaintiffs)[1] for wrongful death based on alleged medical malpractice. The named defendants included Dr. Barnes and the medical group where he practiced known as Beautologie[2] (together defendants), represented by the same counsel. At trial, each side had expert witnesses testify on the issue of whether Dr. Barnes violated the standard of care. Much of that expert testimony was related to Dr. Barnes's response to the phone call from Henry Valderrama. The jury found that Dr. Barnes did not violate the standard of care, and consequently a judgment was entered by the trial court in favor of defendants.

Plaintiffs appeal from the judgment on the ground that the trial court erroneously excluded certain evidence of Beautologie's internal policies, practices and/or training on postoperative follow-up of patients. The trial court excluded the evidence as irrelevant or misleading because it dealt with how non-physician staff (e.g., nurses) at Beautologie were instructed to respond when symptoms were reported, and thus it had no bearing on the issue of the standard of care *for a physician*. We agree with the trial court's analysis and conclude that no error or abuse of discretion has been shown. Accordingly, the judgment is affirmed.

---

[1]     The three minor children of Henry and Melani Valderrama are Landon Valderrama, Parker Valderrama and Kate Valderrama.

[2]     The complaint named as defendants several Beautologie entities, including Beautologie Cosmetic Surgery, Inc.; Beautologie Management Group, Inc.; Beautologie Medical Aesthetics, Inc.; and Beautologie Medical Group, Inc.

**FACTS AND PROCEDURAL HISTORY**

*Plaintiffs' Complaint*

According to plaintiffs' complaint, on July 22, 2016, Melani Valderrama (Melani)[3] presented herself to defendants' care for the following procedures to be performed by Dr. Barnes, at Beautologie's surgical facility in Bakersfield: (1) bilateral breast augmentation with right mastopexy and left crescent lift, and (2) abdominoplasty[4] with liposuction. Dr. Barnes was aware that Melani was 40 years old, mildly obese, and was taking birth control medication, all of which increased her risk for developing blood clots after surgery. After the surgery, Melani developed a fever and cough. Henry Valderrama (Henry) placed a telephone call to defendants to notify them about these symptoms. Allegedly, Dr. Barnes's response was that the symptoms were normal, and he did not request that Melani be immediately seen or examined. This conduct (i.e., Dr. Barnes's failure to take action) constituted medical negligence and resulted in Melani's death on July 27, 2016, from a pulmonary embolism.

*Cause of Death*

There is no dispute that Melani died of a pulmonary embolism. A pulmonary embolism is described in the record as a clot that breaks off from the veins[5] of the lower extremities or abdomen and travels to the heart, goes through the pulmonary artery and lodges in the blood vessels of the lungs, potentially resulting in sudden death. In light of the fatal pulmonary embolism, the case as presented to the jury primarily concerned two essential elements of plaintiffs' medical malpractice claim: (i) whether Dr. Barnes met

---

[3]    Use of first names hereafter for Melani and Henry Valderrama is for ease of expression; no disrespect is intended.

[4]    An abdominoplasty is sometimes called a "tummy tuck."

[5]    A condition described in the record as a potential precursor to a pulmonary embolism is referred to as deep vein thrombosis (or DVT), where clots form in the veins usually of the lower extremities, which clots may break loose and cause a pulmonary embolism.

the standard of care under the circumstances, including when he was informed of Melani's symptoms (i.e., cough and low-grade temperature) at the time of the phone call from Henry; and (ii) if Dr. Barnes failed to meet the standard of care, whether that failure proximately caused Melani's death.  (See *Johnson v. Superior Court* (2006) 143 Cal.App.4th 297, 305 [elements of medical malpractice].)

<u>Centrality of Expert Testimony</u>

Because the professional standard of care of Dr. Barnes had to be established by expert medical testimony in this case (see *Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 1001), the parties designated their respective experts to address that subject at trial.  Plaintiffs' expert on the standard of care issue was Kenneth Bermudez, M.D.  On the issue of causation, or whether Melani could have survived if she had been sent to the hospital on July 26, 2016, following the phone call to Dr. Barnes, plaintiffs' expert was Stuart Friedman, M.D.  There is no dispute that this causation issue also required expert testimony in this case.  (See *Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402.)  Defendants' medical experts were Malcolm Paul, M.D. on the issue of standard of care, and William Klein, M.D. on the issue of causation.

<u>Motions in Limine</u>

On April 29, 2019, the trial court held a pretrial conference to hear and decide several motions in limine.  Defendants sought to exclude the testimony of vocational nurse Analu Montez, L.V.N., and Darshan Shah, M.D. relating to the internal policies, practices or training utilized by Beautologie with respect to its nursing staff on how to respond when patients report certain symptoms after surgery.  Montez had received nurse training on postoperative concerns such as infection, clotting and pulmonary embolism, and Dr. Shah provided the training to the nursing staff at Beautologie on postoperative symptoms of pulmonary embolism or clotting which, if indicated by a patient, would require the nurse to immediately contact the doctor.  The training provided to the nurses

4.

included telling patients to contact the physician or seek urgent medical care if the patient was experiencing certain symptoms, including a cough or fever. Defendants' motions in limine also sought to exclude such evidence and any reliance thereon by plaintiffs' medical expert, Dr. Bermudez.

The motions in limine were made on the ground that the training of nursing staff at Beautologie, or what symptoms the nurses were required to report to the doctor, was irrelevant. According to defendants, such internal policies or practices at Beautologie were not relevant to the precise issue of what *the physician's* (Dr. Barnes's) standard of care was under the particular circumstances involved. Moreover, defendants further argued that to admit such evidence would risk misleading or confusing the jury with respect to the standard of care.

The trial court agreed with defendants' arguments and granted the motions in limine. The trial court explained it was excluding the evidence as irrelevant because (i) there is no issue in the case of a nurse receiving information but failing to report it to a physician, and (ii) the training provided to the nursing staff is distinct from, and not relevant to, the standard of care applicable to Dr. Barnes.

## *Testimony at Trial*

At trial, Henry testified that after the July 22 surgery, his wife developed a cough and had a fever of 100 degrees. At 4:19 p.m., on July 26, 2016, Henry telephoned Dr. Barnes. According to Henry, he told Dr. Barnes that Melani had a severe cough that had persisted over four days and a fever. Dr. Barnes did not ask to speak with Melani directly, did not ask to see her, and he did not direct Henry to take her to urgent care or the emergency room. Dr. Barnes said he would see Melani at her next appointment in three days. Approximately 12 hours later, on July 27, 2016, Melani got up to use the bathroom and suddenly collapsed. Henry called 911. Melani was transported by ambulance to the hospital, where she was pronounced dead at 5:28 a.m. An autopsy report established the cause of death as a pulmonary embolism.

Dr. Barnes testified that in evaluating Melani for surgery, he conducted a risk stratification or assessment. He was aware that Melani was 40 years old and had undergone several surgeries in the past, all without complications. He also was aware of her current risk factors of a body mass index of 32; the length of surgery of three to four hours; and she was taking birth control pills. He considered Melani to be a moderate risk for pulmonary embolism under the Caprini risk scale. Additionally, Dr. Barnes testified that while the risk of blood clots or pulmonary embolism are rare even with respect to abdominoplasty; the risks are comparatively higher for an abdominoplasty than for other forms of aesthetic plastic surgery. Before agreeing to do the surgery, because of Melani's medical history (including a bariatric surgery) Dr. Barnes required that Melani be cleared for surgery by another physician. Melani complied and was cleared for her surgery by two other physicians, one of whom was a cardiologist. Prior to Dr. Barnes performing the surgery, Melani was informed that rare complications could occur with an abdominoplasty, including pulmonary embolism.

According to Dr. Barnes, standard precautions were taken in connection with Melani's surgery to protect against clotting and pulmonary embolism. Shortly before the commencement of the surgery, a blood thinning agent (known as Lovenox) was administered to Melani. During the surgery, pneumatic compression stockings were utilized to produce intervals of pressure around her legs to keep circulation moving. Dr. Barnes also gave instructions to Melani that ambulation was very important post-surgery to reduce the risk of blood clots forming. He instructed Melani, as he did all his patients, to be sure to get up and walk every two hours, and to do so more and more every day.

With respect to the phone call he received from Henry on July 26, 2016, Dr. Barnes noted the tone of the call was not frantic or alarmed. It seemed that a big part of the reason Henry called was to find out if cough syrup, as opposed to cough drops, was something his wife could take to help with the cough. According to Dr. Barnes, "[Henry] said she had a light cough and maybe a low grade fever and he was going to get some

6.

cough syrup and wanted to know whether or not that was okay." In Dr. Barnes's experience, it was not unusual for a patient to have a cough or a low-grade temperature four days after the surgery.

Testimony of Expert Witnesses

As noted, plaintiffs' expert on the standard of care was Dr. Bermudez. Dr. Bermudez admitted that less than 1 percent of patients who undergo abdominoplasty develop deep vein thrombosis (DVT), and only a small fraction of those patients who develop DVT also develop pulmonary emboli. Dr. Bermudez testified that the most common symptoms of pulmonary embolism are rapid heart rate, chest pain and shortness of breath. He said that other symptoms can occur, such as a productive cough or a cough that has blood in it, and leg swelling or leg pain. However, having a fever is not a symptom specific to pulmonary embolism. Dr. Bermudez observed that although a cough and fever are not unusual in the first two days after surgery due to the effects of anesthesia and having a breathing tube down one's throat, he believed that by day four the persistence of such symptoms were potentially more problematic and further inquiry should have been made. Dr. Bermudez's opinion was that, when Henry telephoned and reported Melani's symptoms, Dr. Barnes should have done more on behalf of his patient such as performing a further investigation of her condition, speaking to her directly, having her be seen, or sending her to urgent care or the emergency room. According to Dr. Bermudez, the failure to take responsive action violated the standard of care.

Plaintiffs' expert on the issue of causation and survivability, Dr. Friedman, testified that if Dr. Barnes had sent plaintiff to the hospital after receiving the phone call from Henry, Melani would "absolutely" have survived. According to Dr. Friedman, the hospital staff would have made inquiries concerning her surgery and other factors that would have alerted them that Melani was at risk of blood clotting. A CT angiogram would likely have been ordered to look at the arteries of the lungs to see if there were any clots there, and while awaiting test results the hospital would have started Melani on

Heparin, a blood thinner. In Dr. Friedman's opinion, these steps would have saved Melani's life. A foundation for this opinion was his belief that there was a cumulative or gradual showering of emboli, rather than a sudden one-time event.

Dr. Paul, defendants' expert on the issue of standard of care, testified that DVT and/or pulmonary embolism are considered an inherent risk of undergoing abdominoplasty. He noted that of all the cosmetic surgeries, abdominoplasty has comparatively the highest risk of DVT and pulmonary emboli. Nonetheless, Dr. Paul observed it is still a very rare post-operative occurrence, even for those who undergo an abdominoplasty. He stated that fewer than 1 percent of patients who undergo an abdominoplasty are diagnosed following surgery with DVT, and of those who develop DVT only about one-half of one percent go on to have a pulmonary embolism. Dr. Paul testified that the symptoms or signs of a pulmonary embolism typically include acute onset of chest pain, shortness of breath, and coughing up blood. He stated that a cough, without other complaints, would not be considered a symptom of a pulmonary embolus problem. He also stated that a low-grade fever of 100 degrees is not unusual following a surgery. In fact, he noted that having a breathing tube down a patient's throat during a surgery, as occurred here, will sometimes produce a condition of a slight collection of fluid in the lungs called atelectasis, which leads to postoperative coughing and a low-grade fever. He said, "It's a natural response. Very common." Dr. Paul opined that Dr. Barnes's response to the telephone call from Henry on July 26, 2016, was handled reasonably and met the standard of care that would be expected of a conscientious plastic surgeon in that circumstance. His reasons included that the symptoms of cough and low-grade temperature were not unusual postoperative symptoms, and there were no symptoms reported indicative of pulmonary embolism.

Dr. Klein, defendant's expert witness on the issue of causation, opined that Melani's death by pulmonary embolism was not a gradual or cumulative process, but happened suddenly in a matter of seconds or minutes. His opinion was based on the lack

8.

of any specific symptoms of pulmonary embolism such as shortness of breath, chest pain, or coughing up blood.  He noted that temperature and cough by themselves are not signs or symptoms of pulmonary embolism.  His opinion was also based on the autopsy report indicating the large size of the clots and that they appeared to be fresh, in that they were not present long enough to adhere to the wall of the blood vessels.  Dr. Klein further explained that, in many cases, the first and only symptom of pulmonary embolism experienced by the patient is his or her sudden collapse and death, as occurred here.  Dr. Klein's conclusion was that Melani developed the pulmonary embolism for the first time in the minutes or seconds prior to her collapse and death.

*The Verdict*

On May 9, 2019, the jury reached its verdict.  It found that Dr. Barnes and Beautologie were not negligent in the diagnosis or treatment of Melani.  A polling of the jury showed the verdict was nine to three.  A judgment in favor of defendants followed, from which plaintiffs appealed.

## DISCUSSION

### I.     STANDARD OF REVIEW

In the instant appeal, plaintiffs challenge the correctness of the trial court's evidentiary rulings on motions in limine which excluded certain evidence.  " 'We review a trial court's decision to admit or exclude evidence "for abuse of discretion, and [the ruling] will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice." ' " (*People v. Young* (2019) 7 Cal.5th 905, 931; accord, *Ortiz v. Dameron Hospital Assn*. (2019) 37 Cal.App.5th 568, 584 [evidentiary rulings reviewed for abuse of discretion].)  Discretion will be found to be abused only if the trial court's ruling exceeded the bounds of reason, all of the circumstances before it being considered.  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.)  "An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of

reason and results in a miscarriage of justice. [Citations.] This standard of review affords considerable deference to the trial court provided that the court acted in accordance with the governing rules of law. We presume that the court properly applied the law and acted within its discretion unless the appellant affirmatively shows otherwise." (*Espejo v. The Copley Press, Inc*. (2017) 13 Cal.App.5th 329, 378; *Mejia v. City of Los Angeles* (2007) 156 Cal.App.4th 151, 158.)

Even if an error is demonstrated, it will rarely warrant reversal unless it appears reasonably probable that a result more favorable to the appealing party would have been reached in the absence of error. (*Yield Dynamics, Inc. v. TEA Systems Corp*. (2007) 154 Cal.App.4th 547, 557, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.) "This means the appellant must show not only that error occurred but that it is likely to have affected the outcome." (*Yield Dynamics, Inc., supra,* at p. 557; see also, *Cassim v. Allstate Ins. Co*. (2004) 33 Cal.4th 780, 800 [defining miscarriage of justice]; Cal. Const., art. VI, § 13 [miscarriage of justice required to reverse of a judgment or verdict based on a challenge to evidentiary rulings]; Evid. Code, § 354 [same].)

II.      PRINCIPLES REGARDING A PHYSICIAN'S STANDARD OF CARE

In order to properly frame the evidentiary issue, we first note the relevant principles of a physician's standard of care. The elements of a cause of action for medical malpractice are: (1) a duty to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) a breach of the duty; (3) a proximate causal connection between the negligent conduct and the injury; and (4) resulting loss or damage. (*Johnson v. Superior Court, supra,* 143 Cal.App.4th at p. 305.) "The first element, standard of care, is the key issue in a malpractice action and can only be proved by expert testimony, unless the circumstances are such that the required conduct is within the layperson's common knowledge." (*Lattimore v. Dickey* (2015) 239

Cal.App.4th 959, 968.)[6]  Conceptually, the standard of care is the minimum level of care to which the patient is entitled under the circumstances, and thus it represents the standard "against which the acts of a medical practitioner are to be measured."  (*Alef v. Alta Bates Hospital* (1992) 5 Cal.App.4th 208, 215; accord, *Doe v. Good Samaritan Hospital* (2018) 23 Cal.App.5th 653, 665.)

The standard of care is ascertained by reference to the standard of practice within the same medical profession under the circumstances.  " '[T]he legal standard of care required by doctors is the standard of practice required by their own profession.' [Citation.]  'The courts require only that the physicians and surgeons exercise in diagnosis and treatment that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of the medical profession under similar circumstances.' "  (*Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1081.)  "Thus, liability is not found, and the label of malpractice is not placed upon a physician's actions, unless 'some deviation by the [physician] from the standard of care that his peers consider appropriate in the situation under review' is proven."  (*Burgess v. Superior Court*, *supra*, at p. 1081.)  "In those cases where a medical specialist is alleged to have acted negligently, the 'specialist must possess and use the learning, care and skill normally possessed and exercised by practitioners of that specialty under the same or similar circumstances.' "  (*Lattimore v. Dickey*, *supra*, 239 Cal.App.4th at p. 968.)  Based on the above principles, it is clear that Dr. Barnes had the duty to use, under the

---

[6]     Whether there was a breach by a medical doctor of the standard of care will also ordinarily require expert testimony.  "Whenever the plaintiff claims negligence in the medical context, the plaintiff must present evidence from an expert that the defendant breached his or her duty to the plaintiff and that the breach caused the injury to the plaintiff."  (*Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 123.)

circumstances involved,[7] the same level of skill, prudence and diligence commonly possessed and exercised by plastic surgeons who perform surgeries such as abdominoplasties. As our summary of the trial proceedings indicated, there was considerable expert testimony on this issue.

Additionally, we point out that for purposes of malpractice law, a physician's or surgeon's standard of care is distinct from that of a nurse, and thus a nurse's conduct is not measured by the standard of care required of a physician or surgeon. (*Lattimore v. Dickey*, *supra*, 239 Cal.App.4th at p. 969; *Massey v. Mercy Medical Center Redding* (2009) 180 Cal.App.4th 690, 695; *Alef v. Alta Bates Hospital*, *supra*, 5 Cal.App.4th at p. 215; *Fein v. Permanente Medical Group* (1985) 38 Cal.3d 137, 150–151.)

## III.    TRIAL COURT DID NOT ABUSE ITS DISCRETION IN EXCLUDING THE EVIDENCE

As noted, the subject of the motions in limine brought by defendants was certain testimony of Analu Montez, a licensed vocational nurse (LVN) who formerly worked at Beautologie in postoperative care, and Dr. Shah, the medical director and an owner at Beautologie who trained the nursing staff on postoperative care. Additionally, defendants sought to preclude plaintiffs' expert, Dr. Bermudez, from using or referring to the challenged testimony of Montez or Dr. Shah as a basis for his standard of care opinions. The nature of the challenged testimony is summarized below.

### A.    The Substance of the Excluded Evidence

Based on the transcript of Dr. Shah's deposition provided to the trial court in connection with the motions in limine, it appears that Dr. Shah trained Beautologie's nursing staff on postoperative signs and symptoms to look for that may potentially relate to clotting or pulmonary embolism, in case a patient calls in to report symptoms. The

---

[7]    The focus is on the reasonable degree of skill, knowledge and care ordinarily possessed and exercised by physicians under *the same or similar circumstances* rather than on similar geographic locations. (*Borrayo v. Avery* (2016) 2 Cal.App.5th 304, 310.)

12.

goal of the training was that if certain symptoms were reported, the nurse will inform the doctor of that immediately. He stated: "I train [the nurses] on what to look for in case the patient calls with a cough or a swollen leg to make sure the doctor knows about that immediately." He said he tells the nurses "these are signs and symptoms of a DVT or pulmonary embolism" and if the patient calls to report such symptoms "to immediately get ahold of the doctor and let them know that the patient is exhibiting these signs or symptoms." In his training of the nurses, Dr. Shah would inform them to look for symptoms such as a swollen extremity, pain, shortness of breath, tachycardia, cough and elevated temperature. If such symptoms were indicated by the patient, the nurses were required to immediately contact the doctor.

Based on the transcript of nurse Montez's deposition provided in connection with the motions in limine, she acknowledged receiving training from Dr. Shah on warning signs to look for, postoperatively, including warning signs of DVT's and pulmonary embolisms. She was trained to look for symptoms such as calf pain, chest pain and cough. When asked in her deposition if an elevated temperature was one of the symptoms they were told to look for, Montez responded: "Right, right, any signs of infection, yes." A cough would also be in that category. But when asked broadly "these are signs postoperatively of the potential for embolism," her response was "yes." Later in her deposition, Montez clarified the training she received on cough and increase in body temperature. She said that for increased temperature "our biggest concern was infection." She stated: "[W]e were trained … to think high elevated temperature equals infection so we would always bring the patient in and have them evaluated by our doctors." On the issue of a cough, she stated: "[W]e were trained if anybody had a cough or shortness of breath or anything to either, again, bring them into the office to be assessed by our MD or send them out to an urgent care of ER type basis." Montez further testified at her deposition that if a patient reported a cough with an increased body temperature "[i]t was … not necessarily an indication of blood clotting. It was more an indication that

13.

something is wrong, we need to bring them in." The goal was to have the patient assessed by a doctor if such symptoms were reported.

Finally, it was undisputed that nurse Montez and Dr. Shah did not have any direct clinical involvement with Melani or her husband after the surgery.

B. The Trial Court's Ruling

Defendants' motions in limine argued the evidence should not be admitted at trial nor relied on by plaintiffs' expert (Dr. Bermudez) because the training and practices of nursing staff at Beautologie, including what symptoms the nurses were required to immediately report to the doctor, were irrelevant to the issue of Dr. Barnes's standard of care as a physician in his medical treatment of Melani under the circumstances. Defendants also argued that to admit such evidence would risk misleading or confusing the jury with respect to the standard of care.

The trial court agreed with defendants' and granted the motions in limine. The trial court excluded the evidence as irrelevant because (i) there was no issue in the case of a nurse receiving information but failing to report it to a physician, and (ii) the training provided to the nursing staff was distinct from and not relevant to the standard of care applicable to Dr. Barnes as a physician. On the latter point, the trial court explained it would be improper to have evidence of how Beautologie trained its nurses used at trial as a basis for the standard of care for the physician involved, Dr. Barnes. To do so "would introduce legal error into the case" and the court refused to do so. The trial court further clarified: "There is no separate issue here that an LVN received information that she failed to report to a physician. So there isn't a separate basis for Beautologie's negligence in the case upon the inaction of a [non-physician] medical staff. *This all derives from what Dr. Barnes did or did not do in his judgment as a physician*." (Italics added.) The trial court continued its explanation as follows: "The evidence that's been proffered is that [Henry] Valderrama called Dr. Barnes and was put in touch with Dr. Barnes. Dr. Barnes [from] the plaintiff's point of view did not properly respond to the

14.

information he was receiving [and] he breached the standard of care on the basis of the information he received. That's all legitimate and that's all going to be forthcoming I expect in the case. But the motion [by defendants] is being made that you can't backdoor the policy of Beautologie with respect to their LVN's and what the LVN's are instructed to do and make that [the] standard of care [for Dr. Barnes] either through their testimony or through the testimony of Dr. Bermudez."

The trial court further observed that the internal procedures, protocols and training implemented by Dr. Shah all related to what the nonphysician staff were required to do, and were specifically designed to bring certain matters to the attention of *the physician*. Once that happens, as it did here, "[w]hat the physician does in exercising his independent judgment, … that is a separate issue."[8] The trial court concluded: "We cannot set up the policy and procedure of Beautologie as to what their LVN's and their non physician staff are supposed to do and make them a standard of practice for a physician."

## C. Our Analysis

As noted above, we review the trial court's exclusion of evidence for abuse of discretion. (*People v. Young, supra,* 7 Cal.5th at p. 931.) "An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason and results in a miscarriage of justice. [Citations.] This standard of review affords considerable deference to the trial court provided that the court acted in accordance with the governing rules of law. We presume that the court properly applied the law and acted within its discretion unless the appellant

---

[8] As the trial court observed, the deposition testimony reflected these were policies in place for the nursing staff, not for physicians: "There is nothing that you [plaintiffs' attorney] quoted me that says Dr. Shah has instructed Dr. Barnes as to what his standards are as a physician."

15.

affirmatively shows otherwise." (*Espejo v. The Copley Press, Inc.*, *supra,* 13 Cal.App.5th at p. 378; *Mejia v. City of Los Angeles, supra,* 156 Cal.App.4th at p. 158.)

As they did in the trial court, plaintiffs here argue that Montez's and Dr. Shah's testimony regarding the training given to Beautologie's nurses on postoperative care, particularly on what symptoms would require the immediate attention of a physician to protect the patient from such things as DVT or pulmonary embolism, was relevant to the issue of Dr. Barnes's standard of care. Plaintiffs contend that such evidence was relevant to the standard of care because it showed there was inconsistency between Beautologie's own policies or practices for its nonphysician or nursing staff in regard to postoperative care and the medical judgment exercised by Dr. Barnes. According to plaintiffs, Dr. Barnes's failure to follow the policies and practices of the facility where he practiced was relevant to a proper determination of the standard of care. Additionally, plaintiffs argue such evidence should have been admissible to impeach defendants' experts on standard of care, and/or to support plaintiffs' experts.

Plaintiffs' arguments are unconvincing. The alleged professional negligence in this case was that of Dr. Barnes, not that of a nurse or other non-physician staff. Dr. Barnes personally handled the call from Henry and spoke directly with him. There was no third-party intermediary, such as a nurse. Therefore, evidence of internal policies, practices and/or training at Beautologie regarding postoperative follow-up by nurses or other non-physicians of patients was irrelevant in this case. A physician's or surgeon's standard of care is distinct from that of a nurse. (*Lattimore v. Dickey*, *supra*, 239 Cal.App.4th at p. 969; *Massey v. Mercy Medical Center Redding, supra,* 180 Cal.App.4th at p. 695.) As stated by our Supreme Court, " '[T]he legal standard of care required by doctors is the standard of practice required by their own profession.' [Citation.] 'The courts require only that the physicians and surgeons exercise in diagnosis and treatment that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of the medical profession under similar circumstances.' " (*Burgess v.*

*Superior Court* (1992) 2 Cal.4th 1064, 1081; accord, *Alef v. Alta Bates Hospital*, *supra*, 5 Cal.App.4th at p. 215.)

In this case, consistent with this definition of the standard of care, each side presented extensive testimony at trial from their own qualified medical expert on the question of the standard of care for Dr. Barnes *as a physician*, and whether Dr. Barnes violated that standard under the circumstances. Thus, plaintiffs and defendants supported their respective positions on the standard of care by offering testimony relevant to that precise issue. In contrast to the evidence presented at trial, the evidence excluded by the trial court was not relevant to the standard of care of Dr. Barnes *as a physician* and was properly excluded. As defendants correctly state, "Beautologie's policies for LVN staff do not set the standard of care for physicians." We agree with the trial court's reasoning on this issue, including that it would be improper to introduce evidence of how Beautologie trained its nurses as a basis for evaluating the standard of care for the physician involved, Dr. Barnes.[9] Furthermore, it is clear that the introduction of such evidence at trial would have confused or misled the jury into believing that the training and protocols put in place by Beautologie for its nursing staff may be considered to establish the standard of care for Dr. Barnes, as a physician, when he exercised his independent medical judgment under all the circumstances. As the trial court rightly observed, that would have introduced legal error into the case.

Similarly, the trial court refused to allow Dr. Shah's statements of how he trained Beautologie's nursing staff to be introduced as *impeachment* of defendant's expert on the standard of care. As the trial court explained: "You can't get it in under the guise of impeachment. The way the matter has been presented to me Dr. Shah did not give admissible opinion testimony that in his opinion as a medical doctor the signs and

---

[9]    Additionally, we note the record reflects that neither Dr. Shah nor nurse Montez were ever designated as expert witnesses by plaintiffs. Further, neither had any relevant contact or percipient involvement with the Valderramas.

17.

symptoms that a physician needs to respond to for a pulmonary embolism are X, Y, Z. None of that was testified to by Dr. Shah. Dr. Shah was testifying as to what he would expect his [nursing] staff to do if they were presented with certain information [and that] fundamentally would be to ensure that the patient communicated with a physician….” We discern no error or abuse of discretion in the trial court's analysis. It is clear the trial court's ruling did not exceed the bounds of reason or was arbitrary under the circumstances before it. Rather, since the proffered evidence relating to how nurses were trained was irrelevant to prove the standard of care for the physician involved, it was likewise irrelevant for the purpose of impeaching defendants' expert on the standard of care.

We conclude that no abuse of discretion has been demonstrated by plaintiffs. To the contrary, we hold the trial court was correct to exclude the evidence both because it was irrelevant to the standard of care issue in this case and because it would likely have confused or misled the jury on that same issue. (Evid. Code, § 350, 352.)

## DISPOSITION

The judgment of the trial court is affirmed. Defendants are awarded costs on appeal.

FRANSON, ACTING P.J.

WE CONCUR:

MEEHAN, J.

SNAUFFER, J.

18.